**Richard S. RASKIN, Plaintiff–Appellant,**

v.

**The WYATT COMPANY, Defendant–Appellee.**

**No. 714, Docket 96–7570.**

United States Court of Appeals, Second Circuit.

Argued Dec. 17, 1996.

Decided Sept. 9, 1997.

David L. Rose, Rose & Rose, P.C., Washington, DC (David M. Wachtel, on the brief), for Plaintiff–Appellant.

D. Michael Underhill, Morgan, Lewis & Bockius, LLP, Washington, DC (Robert J. Smith, John H. Williamson, Morgan, Lewis & Bockius, LLP, Washington, DC; Anita W. Coupe, James P. Philbin, III, René K. McCurry, Morgan, Lewis & Bockius, LLP, New York City, on the brief), for Defendant–Appellee.

Before: WALKER, JACOBS and LEVAL, Circuit Judges.

JACOBS, Circuit Judge:

Richard Raskin appeals from a grant of summary judgment in favor of his former employer, the Wyatt Company ("Wyatt" or "the Company"). Raskin alleged that Wyatt violated both § 4 of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 623, and the New York State Human

Rights Law (N.Y.SHRL), N.Y. Exec. Law. §§ 290–301, by failing to promote him to the position of office manager of Wyatt's New York office and then constructively discharging him, by reason of his age. Wyatt moved for summary judgment on all of Raskin's claims, and the District Court for the Southern District of New York (Knapp, *J.*) granted Wyatt's motion in its entirety. *Raskin v. Wyatt Co.*, Memorandum and Order, No. 94 CIV 2314(WK), 1996 WL 175087 (S.D.N.Y. Apr.15, 1996). On appeal, Raskin argues that summary judgment was improper because 1) under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 1794, 104 L.Ed.2d 268 (1989) (plurality opinion), he was entitled to a mixed-motive burden shift; 2) under the district court's analysis pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), Raskin had shown the existence of material issues of fact as to age discrimination, pretext, and constructive discharge; and 3) the district court improperly failed to credit a statistical report that supposedly demonstrates Wyatt's age discrimination.

We affirm.

## BACKGROUND

We recount the facts that bear on the issues presented in this appeal, and we do so in the light most favorable to Raskin, as the party against whom summary judgment has been entered.

Raskin has been an actuary since 1957. In June 1983, at age 46, he went to work for Wyatt, a management consulting company specializing in employee benefits, at Wyatt's 80–person New York office. From 1983 until he left Wyatt in 1992, Raskin was one of the three or four most successful consultants at the New York office; he discharged substantial responsibility and generated substantial revenue.

In October 1991, Henry Bright—the 56–year old office manager of the New York office—elected to retire. The president of Wyatt, Michael Davis, solicited nominations to fill the position.[1] Several weeks later, Davis took Raskin out to lunch to discuss the position. At lunch, Davis said that he assumed that Raskin (who was then 55) did not want to be office manager so late in his career; Raskin responded that he was indeed interested in the position, and that he had no intention of retiring for at least another eight years. The conversation then turned to other aspects of Raskin's candidacy.

On December 10, 1991, Davis interviewed employees in the New York office concerning the various candidates for the office manager position. There were at least six candidates: three were from New York (Raskin, age 55; Arnold Malasky, age 51; and Edward Shumsky, age 42); and three were the heads of other Wyatt offices (ages 48, 48, and 50). When Davis met with Raskin, Davis expressed his concern that Raskin might not remain with Wyatt long enough to learn the job. During the interview process, it became clear that Raskin had both strong supporters and strong detractors. Raskin's supporters opined that he was the "right man" for the job, he was the "best successor" to Bright, he "had a vision," and he was both a leader and a manager. Raskin's detractors said, *inter alia*, that he was "arrogant," "venal," "a bully," and "power crazy."

As early as December 10, Davis had apparently concluded that Raskin would not be the new office manager. On December 27, the Board of Directors deferred making a final decision. On January 15, 1992, a new candidate emerged: Paul Daoust, the 44–year-old manager of Wyatt's Boston office. Davis recommended to the Board that Daoust be appointed as the New York office manager, and the appointment was approved on January 29, 1992, effective March 1.

When Raskin learned he would not be appointed manager, he was unhappy and proposed to Davis, at a meeting on January 22, 1992, that the Company enter into an employment agreement for Raskin's future services. Raskin's proposed agreement included: 1) compensation for all future years of employment at a rate at least equal to his

---

**1.** Office managers at Wyatt have total responsibility for the management, development, and direction of their offices; this includes budgeting, hiring, strategic direction, salary review, and bonus allocation. *Raskin*, 1996 WL 175087, at *1.

1991 pay, increasing annually in accordance with the Consumer Price Index; 2) up to sixty months of severance pay at $25,000 per month upon discharge for any reason whatsoever; 3) twenty-four months of severance pay upon Raskin's voluntary resignation; 4) trigger of the "discharge" severance benefits upon any substantial change in Raskin's client and management responsibilities; and 5) a non-compete clause. Although it appears that employment agreements were highly unusual at Wyatt, Raskin testified at his deposition that Davis agreed to such an arrangement in Raskin's case with the proviso that Daoust, as the new office manager, would have to sign off on the terms relating to job duties.

Daoust and Raskin went over Raskin's proposed employment agreement in a series of meetings held in February 1992. Daoust refused to guarantee Raskin's compensation level or his job duties, but did accept Raskin's other terms (the severance provisions and non-compete agreement). *Raskin,* 1996 WL 175087, at *3. Raskin refused to sign this agreement, "because the proposal [gave Raskin] no security either with respect to clients or income." Appellant's Brief at 18. Daoust told Raskin to leave if he found this arrangement unsatisfactory, but nevertheless tried to convince Raskin to stay. Raskin resigned and went to work for one of Wyatt's competitors.

Raskin filed his complaint on April 1, 1994. Wyatt moved for summary judgment on all of Raskin's claims on November 13, 1995. In opposition to the motion, Raskin submitted, *inter alia,* two pieces of evidence to support his claims of age discrimination: 1) a copy of Wyatt's early retirement plan, the "Supplemental Retirement Plan" (the "Plan" or the "early retirement plan"), which provides substantial benefits to employees electing to retire between ages 55 and 64; and 2) a statistical report prepared by a labor market economist, Dr. Richard F. Wertheimer, entitled "An Analysis of Employment Practices with Respect to Age at the Wyatt Company" ("the report" or the "Wertheimer report").

In granting Wyatt's motion, the district court assumed *arguendo* that Raskin had made out a prima facie case of age discrimination, and found that Wyatt had set forth a legitimate non-discriminatory reason for failing to give Raskin the position—namely, that Raskin's appointment would have "perpetuated and, indeed, exacerbated, the factious atmosphere and poor morale in the New York office." 1996 WL 175087, at *5. The district court granted summary judgment on the ground that Raskin had failed to raise a material issue of fact as to pretext or age discrimination. In making the age discrimination determination, the court discussed both the early retirement plan and the Wertheimer report:

It is well settled that voluntary early retirement incentive plans are lawful and do not, in and of themselves, constitute age discrimination. Unlike prohibitions against race and gender discrimination, which prohibit anything that prefers one class over another, the prohibition against age discrimination does not prohibit programs that benefit younger workers. The [Plan] is one such program in that it ensures continued opportunity for advancement within the company. Absent such a plan, the younger workers just out of college and graduate school would very likely end up on unemployment in their forties. With the plan, however, younger workers are able to advance more quickly, filling the shoes of the older workers who take advantage of the generous early retirement opportunity.

And that explains plaintiff's statistics. Even if we were to accept them as God's truth, as we must on a motion for summary judgment, they do not defeat defendant's motion. Where, as here, employees have generous retirement plans and accrued wealth later in their careers, it is to be expected that retirement will occur earlier, and that promotion rates for employees over 50 would be lower than for those under 50.

Thus, we are unpersuaded by this evidence that there existed in defendant's workplace a general animus toward older workers, and that that animus was the real

·reason behind defendant's failure to promote plaintiff.

*Raskin,* 1996 WL 175087, at \*5–\*6.

## DISCUSSION

We review a grant of summary judgment *de novo* and view the facts in the light most favorable to the non-movant. *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *LaFond v. General Physics Servs. Corp.,* 50 F.3d 165, 171 (2d Cir.1995).

The ADEA forbids employers from discriminating in hiring, discharge, or the setting of "compensation, terms, conditions, or privileges of employment" by reason of the age of an employee. 29 U.S.C. § 623(a)(1); *see also Hazen Paper Co. v. Biggins,* 507 U.S. 604, 609, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993). The ADEA's protection extends only to those individuals who, like Raskin, are over 40 years old. 29 U.S.C. § 631(a). Claims under the ADEA and the NYSHRL receive the same analysis as claims under Title VII. *See, e.g., Fisher v. Vassar College,* 114 F.3d 1332, 1335 (2d Cir. 1997) (in banc); *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 913 (2d Cir.1997).

■ ADEA cases, like Title VII cases, can be characterized as 1) pretext cases and 2) mixed-motive cases. *See Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1180–81 (2d Cir. 1992) (examining differences between pretext and mixed-motive cases). In pretext cases, we use the familiar burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In mixed-motive cases, we use the different analysis set out in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 1794, 104 L.Ed.2d 268 (1989) (plurality opinion): if the plaintiff establishes that a prohibited discriminatory factor played a "motivating part" in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway. *See also Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 180 (2d Cir.1992).

On appeal, Raskin makes arguments under both the *Price Waterhouse* and *McDonnell Douglas* frameworks, and we address those arguments separately.

### I. *Price Waterhouse*

■ Raskin argues that the district court improperly granted summary judgment to Wyatt using *McDonnell Douglas* pretext analysis rather than using the *Price Waterhouse* mixed-motive analysis to shift the burden of proof to Wyatt. To warrant a *Price Waterhouse* burden shift, the plaintiff must initially show that "an impermissible criterion was in fact a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Servs.,* 82 F.3d 16, 23 (2d Cir.1996) (quoting *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794), *petition for cert. filed,* (U.S. July 10, 1996) (No. 96–5214). Only after it is shown that "the forbidden animus was a motivating factor in the employment decision" does the burden shift to the employer to prove that it would have made the same decision absent the discriminatory factor. *Ostrowski,* 968 F.2d at 181.

■ Because the plaintiff must show that the evidence is *sufficient* to allow a factfinder to infer both permissible and discriminatory motives, *Lightfoot,* 110 F.3d at 912, the plaintiff's initial burden in a *Price Waterhouse* mixed-motive case is heavier than the *de minimis* showing required to establish a prima facie *McDonnell Douglas* case, *see de la Cruz,* 82 F.3d at 23. The types of indirect evidence that suffice in a pretext case to make out a prima facie case— or even to carry the ultimate burden of persuasion—do "not suffice, even if credited, to warrant" a *Price Waterhouse* burden shift. *Ostrowski,* 968 F.2d at 182. Evidence potentially warranting a *Price Waterhouse* burden shift includes, *inter alia,* policy documents and evidence of statements or actions by decisionmakers "that may be viewed as *directly reflecting* the alleged discriminatory

attitude." *Lightfoot*, 110 F.3d at 913 (quoting *Ostrowski*, 968 F.2d at 182) (emphasis added). In short, to warrant a mixed-motive burden shift, the plaintiff must be able to produce a "smoking gun" or at least a "thick cloud of smoke" to support his allegations of discriminatory treatment. *Fields v. New York State Office of Mental Retardation and Developmental Disabilities*, 115 F.3d 116, 124 (2d Cir.1997) (quoting *Tyler*, 958 F.2d at 1187).

Raskin points to two pieces of evidence: (A) Wyatt's early retirement plan, which provides incentives to employees who voluntarily take early retirement, and (B) Davis's statements to Raskin in December 1991 regarding the office manager opening. For the reasons stated below, these showings (separately or together) are insufficient to allow a factfinder to infer an illegal discriminatory motive for Wyatt's employment decision. Raskin has therefore failed to meet his burden; a mixed-motive burden shift was neither required nor appropriate.

### A. Wyatt's Early Retirement Plan

█ Wyatt adopted the Supplemental Retirement Plan in 1983 and reinstated it yearly thereafter. According to its preamble, the Plan's purpose is

to provide for an orderly transition in the management and senior consulting positions of the Wyatt Company ... and to create more opportunities for younger associates to move into such positions by providing additional retirement benefit incentives for certain U.S. employees to retire before age 65.

In rough outline, the Plan provides that any employee who is compensated above a cer-

tain level and has attained fifteen years of service may elect early retirement between ages 55 and 64 (or when age plus years of service equals 75), and thereby enjoy specified additional retirement benefits. The early retirement plan is voluntary; an employee who turns 65 and is no longer eligible for the supplemental benefits loses no vested benefits under Wyatt's Pension Plan.

Raskin recognizes that he was never eligible for the Plan, having left before accruing fifteen years of employment. His argument is that the Plan amounts to direct evidence of Wyatt's discriminatory intent and therefore supports a *Price Waterhouse* burden shift. We disagree.

The ADEA creates a safe harbor for an employer's early retirement programs:

It shall not be unlawful for an employer ... to take any action otherwise prohibited under [the ADEA] to observe the terms of a bona fide employee benefit plan that is a voluntary early retirement incentive plan consistent with the relevant purpose or purposes of this chapter.

29 U.S.C. § 623(f)(2)(B)(ii). A "bona fide employee benefit plan" is one in which substantial benefits are paid to employees who are covered by it. *See Cipriano v. Board of Educ.*, 785 F.2d 51, 54 (2d Cir.1986); *see also United Air Lines, Inc. v. McMann*, 434 U.S. 192, 194, 98 S.Ct. 444, 446, 54 L.Ed.2d 402 (1977).

"There is nothing inconsistent with the ADEA in offering older employees compensation for leaving the workforce, as is plain from the fact that retirement plans are included within" the Act's protection. *Cipriano*, 785 F.2d at 56.[2] "[A]n offer of incentives to retire early is a benefit to

---

2. *Cipriano* dealt with an earlier version of the ADEA. Prior to 1990, § 4(f)(2) of the ADEA provided that it was not unlawful for an employer to

observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual ... because of the age of such individual[.]

*See Cipriano*, 785 F.2d at 52–53. The Older Workers Benefit Protection Act of 1990 ("OWBPA"), 29 U.S.C. § 621 *et seq.*, amended the ADEA, and again explicitly exempted voluntary early retirement plans that were consistent with the ADEA's goals. *See Lyon v. Ohio Educ. Ass'n and Prof'l Staff Union*, 53 F.3d 135, 140 n. 7 (6th Cir.1995); *see also* S.Rep. No. 263, 101st Cong., 2d Sess. 28 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509 ("early retirement incentive plans ... that impute years of service and/or age would continue to remain lawful"). *Cipriano's* analysis therefore remains viable despite the OWBPA's amendments to the ADEA.

the recipient, not a sign of discrimination." *Henn v. National Geographic Soc'y,* 819 F.2d 824, 828 (7th Cir.1987). Although an employer may not *compel* an employee to retire early, *see EEOC v. Johnson & Higgins, Inc.,* 91 F.3d 1529, 1540 (2d Cir. 1996), *petition for cert. filed,* 65 U.S.L.W. 3755 (May 1, 1997) (No. 96–1743), there is no prohibition against *permitting* early retirement, *Cipriano,* 785 F.2d at 58; *EEOC v. Home Ins. Co.,* 672 F.2d 252, 261 (2d Cir.1982), or offering inducements to retire early, *see Cipriano,* 785 F.2d at 56.

On one level, it can be said that Wyatt's Plan creates promotion opportunities for younger employees, and thus reflects a business preference for a younger work force. But the issue here is whether the fact of the Plan, or its terms, can be used as evidence of an illegal intent under the ADEA. Although the ADEA contemplates that a Plan and its terms might describe "action otherwise prohibited under" the Act, the ADEA nevertheless expressly provides that "[i]t shall not be unlawful." 29 U.S.C. § 623(f). If the adoption and implementation of an early retirement plan are lawful, the plan cannot logically serve as evidence of discrimination that is unlawful. Moreover, the ADEA's carve-out for legitimate early retirement plans reflects a congressional purpose to allow employers to use them uninhibited by a risk of liability. Use of such plans as evidence of illegal discriminatory intent to achieve other ends would of course create a powerful *disincentive* to offer such plans.

In any event, even if Raskin could cite Wyatt's Plan as evidence of intent to get rid of older employees, he still would not be entitled to a *Price Waterhouse* burden shift because he has made absolutely no showing that age played a substantial role in the employment decision in his case. *See Ostrowski,* 968 F.2d at 182; *de la Cruz,* 82 F.3d at 23.

**B. Davis's statements to Raskin.**

■ The other evidence Raskin cites as directly showing age discrimination (and warranting a mixed-motive burden shift) is Davis's comments to the effect that Raskin might not be interested in the manager's position because of his age. At his deposition, Davis testified that Raskin had indicated in the past that he was interested in being manager of the New York office, and that Davis had taken Raskin to lunch shortly after the vacancy was announced, in October 1991, to discuss whether or not Raskin was "interested in being a candidate" for office manager. Davis Dep., Oct. 6, 1994, at 78, 85. Raskin observed at his deposition that Davis wanted to discuss the position with him because of Raskin's status as "one of the largest, if not the largest, business getter in the office." Raskin Dep., Feb. 16, 1995, at 408. Raskin recalled his conversation with Davis as follows:

> [Davis] asked me—I think he said—he presumed that I didn't want to be the office manager so late in my career and I told him that was not the case; that I had no intention to retire now; that when I knew this [the office manager position] was a possibility, I had spoken to my wife and we had really both said that we were well away from retirement; that my wife is a school teacher, and that retirement was not an immediate issue with us and that I had expected to work for at least another eight years to sixty-three-and-a-half, which ... was slightly more than eight years from then, eight-and-a-half years from the time that we were speaking.

*Id.* at 410.[3]

But as Raskin's deposition testimony shows, once Davis ascertained Raskin's interest in the position, Davis turned the conversation to other issues, including Raskin's trouble interacting with Wyatt employees in the Company's Washington D.C. office and Raskin's poor relationship with the manager of the Stamford, Connecticut sub-office, Arnold Malasky. Raskin conceded that his re-

---

**3.** In Raskin's December 1995 declaration, he characterized the discussion somewhat differently: when Raskin expressed to Davis his interest in becoming the manager of the New York office, Davis "responded that he believed someone [Ras-

kin's] age might not want to accept the challenge of performing in a new role." Moreover, Raskin stated that Davis "tried to convince [Raskin] not to change paths at what he called a 'late stage' of [Raskin's] career." Raskin Decl. at 1.

lationship with Malasky was a weakness in his candidacy. Raskin Dep. at 242–43.

■ During the employee interview process in mid-December, Davis and Raskin met a second time to discuss the office manager position. Raskin's declaration in opposition to summary judgment states that Davis expressed concern at that meeting that Raskin "would not remain with Wyatt long enough to learn the manager's job." Raskin Decl. at 1–2. In his deposition eleven months earlier, however, Raskin had testified that he could not remember the points that were covered during the mid-December meeting with Davis (except that he thought that he and Davis had discussed Raskin's willingness to give up clients if he became office manager). Raskin Dep., Feb. 16, 1995, at 447–48. To the extent that Raskin's earlier deposition testimony is at odds with his declaration, we follow the rule that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 619 (2d Cir.1996); *see also, e.g., Mack v. United States,* 814 F.2d 120, 124 (2d Cir.1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.")

To shift the burden of proof to his employer, Raskin had to make a showing that age "played some part in the decision-making process." *Tyler,* 958 F.2d at 1183 (citation omitted). Raskin has made no such showing. Davis was no doubt a "person[ ] involved in the decisionmaking process." *Ostrowski,* 968 F.2d at 182 (1992). As such, however, he had a legitimate reason to confirm Raskin's interest in a career change notwithstanding the possibility that Raskin would have the option of taking early retirement.[4] The ADEA does not make all discussion of age taboo. Nor does the fact that Raskin's eligibility for early retirement came up in a conversation about Raskin's qualifications for, and interest in, the office manager position support an inference that age played a role in Wyatt's decision not to offer Raskin the position. Davis's comments do not reflect discriminatory animus, or show that Raskin's age "was in fact a 'motivating' or 'substantial' factor in the employment decision." *de la Cruz,* 82 F.3d at 23 (quoting *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794). This conversation is therefore insufficient to shift the burden of proof to Wyatt.

*Lightfoot v. Union Carbide Corp.,* 110 F.3d 898 (2d Cir.1997), does not require a contrary result. We recently ruled in that case that a 56–year–old terminated employee had presented sufficient evidence to warrant a mixed-motive instruction where: 1) an employee who was involved in the decisionmaking process in effect admitted that the company favored the careers of younger employees (the company had "a high potential category where they take particular interest in young talented people"), and expressed his belief that Lightfoot had been terminated in part because of his age; and 2) the ultimate decisionmaker had "expressed surprise and disbelief when [the employee] said he wanted to work until he was seventy years old." *Id.* at 913.

Here, Davis was probing an issue that was germane to the joint interests of the employee and the Company in filling a key position. Davis did not indicate surprise or disbelief that Raskin was interested in competing for the spot; indeed, Davis took Raskin out to lunch to see if Raskin was interested. Raskin testified that when he stated his intent to work for another eight years, the conversation then turned to the procedural aspects of the manager selection, and then to other substantive aspects of Raskin's candidacy. These circumstances do not support a *Price Waterhouse* shift of burden.

## II. *McDonnell Douglas*

### A. Burden Shifting in 'Pretext' Cases

■ In order to establish a prima facie case of age discrimination in violation of the ADEA, an employee must show 1) that he was within the protected age group, 2) that

4. Raskin's expert economist noted in his report that at the time Raskin resigned, he would have become eligible for early retirement in 6.25 years or less.

he was qualified for the position at issue, 3) that he suffered an adverse employment decision, and 4) that the position was ultimately filled by a person not of the protected class. *Fisher v. Vassar College*, 114 F.3d at 1335. The burden of establishing a prima facie case is not onerous, *Scaria v. Rubin*, 117 F.3d 652 (2d Cir.1997) (per curiam); we assume arguendo that Raskin has met these minimal requirements.

 Once an ADEA plaintiff has established a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The ultimate burden of persuasion, however, remains at all times with the plaintiff. *Fisher*, 114 F.3d at 1335. The district court found that Wyatt had articulated a legitimate, non-discriminatory reason for its failure to promote Raskin: "that [Raskin's] appointment would have perpetuated and, indeed, exacerbated, the factious atmosphere and poor morale in the New York office." *Raskin*, 1996 WL 175087, at *5. During the office manager selection process, numerous interviews showed that Wyatt employees had serious problems with Raskin, for reasons having nothing to do with his age. Alan L. Reed, a senior actuary at Wyatt, said that Raskin was "abrasive, unlikable, arrogant, and disruptive," and that Raskin "frequently disparaged the abilities of Wyatt associates in other disciplines, to the point where he undermined the purpose of meetings to encourage Wyatt consultants to cross-sell other Wyatt services." Reed Decl. at 1–2. Edward M. Shumsky, who was himself an internal candidate for New York manager, suggested that Davis look to an outside candidate to head up the New York office, because of the office's problems with morale and factions. Shumsky felt that Raskin was "abrasive," "undiplomatic," and "divisive," and that his "divisiveness outweighed his substantive contributions to the office." Shumsky Decl. at 1–2. Thomas M. Young, the head of Wyatt's New Jersey sub-office, said that Raskin had a reputation for being "non-collegial, confrontational[,] and ob-structionist," and "unable to reach compromises with those with whom he disagreed"; thought that Raskin was "partly responsible for the low morale" in the New York office; and warned that Raskin's designation would have been "unpopular with most of the senior consultants in the Stamford and New Jersey offices, as well as some of the consultants in the Manhattan office." Young Decl. at 2–3. Arnold M. Malasky, the manager of the Connecticut sub-office, and the other insider candidate for manager, believed that "Raskin would have been the worst possible office manager for the New York region"; Malasky told Davis that he did not expect to remain at Wyatt for long if Raskin were selected. Malasky Decl. at 3. Davis summarized the results of his employee interviews as follows:

> [Raskin] created an immense amount of stress in the office, because of the way he treated people, and the more I listened, the more I learned[ ] the degree to which he created this stress in the office. And the words that people used to describe him were words that ... almost weren't part of the Wyatt lexicon. It was very unusual. A monster, a disaster, venal person.

Davis Dep., Oct. 6, 1994, at 97–98. We agree with the district court that Wyatt proffered a non-discriminatory reason for the failure to promote Raskin; indeed, Raskin does not contest this point.

 Once the defendant proffers a legitimate, non-discriminatory reason, a plaintiff resisting summary judgment must raise a genuine issue of material fact concerning whether the employer's proffered reason was pretextual and whether the true reason for the adverse employment decision was more likely than not the illegal discrimination alleged by the plaintiff. *Scaria*, 117 F.3d at 654; *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1225 (2d Cir.1994). In deciding that issue,

> the judge must analyze the evidence, along with the inferences that may be reasonably drawn from it, and decide if it raises a jury question as to whether the plaintiff was the victim of discrimination.

*Scaria*, 117 F.3d at 654 (quoting *Fisher*, 114 F.3d at 1347). Absent a triable issue of fact as to discrimination, summary judgment for the defendant is appropriate. *See id.; Holt v. KMI–Continental, Inc.*, 95 F.3d 123, 132–34 (2d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1819, 137 L.Ed.2d 1027(1997) (No. 96–1260); *Woroski v. Nashua Corp.*, 31 F.3d 105, 110 (2d Cir.1994).

The district court concluded that Raskin's evidence failed to create a material fact issue as to whether Wyatt discriminated against Raskin on the basis of his age. *Raskin*, 1996 WL 175087, at *6. Raskin relied on: 1) Wyatt's early retirement plan, 2) Davis's statements to Raskin, and 3) the Wertheimer report. We have already concluded that neither the early retirement plan nor the Davis conversations raise an issue of fact of age discrimination for purposes of *Price Waterhouse* analysis. For the same reasons, we now conclude that neither one raises an issue of material fact as to age discrimination under *McDonnell–Douglas*. We now turn our attention to the Wertheimer report.

### B. The Wertheimer Report

Raskin's expert labor market economist, Richard F. Wertheimer, submitted to the district court a 25–page statistical report entitled "An Analysis of Employment Practices with Respect to Age at the Wyatt Company," containing data on the promotion and departure of Wyatt's employees over the twenty-six month period from September 1991 through December 1993, and sorting the data by employee age. Wertheimer summarized his conclusions as follows:

> In my professional opinion, all of the evidence presented in this report is consistent with a pattern of the Wyatt Company treating older workers differently from workers under age 50. Starting at age 50, older workers no longer receive promotions. Starting at age 55, the termination rate increases nearly ten-fold. This termination rate leads to a dramatic drop in Wyatt's utilization of workers age 55 and over. While part of this pattern may be attributable to financial incentives provided by Wyatt pension plans, there are also older workers for whom the Wyatt

pension plans provide a strong financial incentive to stay employed at Wyatt. Thus, the high rate of termination of older workers and their underrepresentation in the Wyatt workforce can only be attributed in part to the financial incentives of the Wyatt pension plans.

Wertheimer Report 18. The particular findings that supposedly support that conclusion generally rely on the phenomenon that Wyatt employees, relative to their counterparts in the workforce (as defined by Wertheimer), are more likely to see their careers level off by 50 or 55, and are more likely to leave work between ages 55 to 65.

In rejecting the Wertheimer report, the district court observed that its conclusions merely illustrate the cause and effect between a generous early-retirement plan and a declining number of remaining employees who qualify for it. *Raskin*, 1996 WL 175087, at *5. Judge Knapp also referenced certain errors and fallacies identified by Wyatt's expert economist, Dr. Alan Gustman.

Raskin argues that Judge Knapp rejected the Wertheimer report because he thought it lacked weight, and thereby usurped the role of the jury. As we read the opinion, Judge Knapp concluded that the report was probative of no material fact, from which we deduce that it was, in Judge Knapp's view, irrelevant and inadmissible. *See In re Air Disaster*, 37 F.3d 804, 824 (2d Cir.1994) (district court may exclude "unhelpful" expert testimony under Fed.R.Evid. 702); *United States v. Khan*, 787 F.2d 28, 34 (2d Cir.1986) (expert evidence is not immune from the relevance requirement of Fed.R.Evid. 401). We therefore can review this ruling as evidentiary in character; and under that analysis we conclude that Judge Knapp's ruling easily satisfies the deferential standard of review for evidentiary rulings.

### 1. Standard of Review

■■■■ The district court has broad discretion in choosing whether to admit evidence. *See United States v. Local 1804–1, Int'l Longshoremen's Assoc.*, 44 F.3d 1091, 1095 (2d Cir.1995); *United States v. Wong*, 40 F.3d 1347, 1378 (2d Cir.1994). Accordingly, we review a district court's evidentiary

rulings for manifest error. *See Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (district judge's admission or exclusion of evidence "is to be sustained unless manifestly erroneous"); *Spring Co. v. Edgar*, 99 U.S. 645, 658, 25 L.Ed. 487 (1878); *see also Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir.1997); *Sage Realty Corp. v. Insurance Co. of N. Am.*, 34 F.3d 124, 128 (2d Cir.1994). The same standard of review applies to a district court's evidentiary rulings on expert testimony. *See United States v. DiDomenico*, 985 F.2d 1159, 1163 (2d Cir.1993); *United States v. Boissoneault*, 926 F.2d 230, 232 (2d Cir.1991).

■■■ The principles governing admissibility of evidence do not change on a motion for summary judgment. Rule 56(e) provides that affidavits in support of and against summary judgment "shall set forth such facts as would be *admissible in evidence*." Fed. R.Civ.P. 56(e) (emphasis added); *see also Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 498 (2d Cir. 1962) ("Since the object [of summary judgment] is to discover whether one side has no real support for its version of the facts, the Rule specifically states that affidavits shall 'set forth such facts as would be admissible in evidence.' ") (citation omitted). Therefore, only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment. *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir.1988); *see also United States v. United States Gypsum Co.*, 340 U.S. 76, 85, 71 S.Ct. 160, 167, 95 L.Ed. 89 (1950) (right to present evidence to a court on summary judgment does not require the court to admit irrelevant evidence); *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 175–76 (5th Cir.1990) ("As a general rule, the admissibility of evidence on a motion for summary judgment is subject to the same rules that govern the admissibility of evidence at trial.").

■■■ Because the purpose of summary judgment is to weed out cases in which "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment. Although disputes as to the validity of the underlying data go to the weight of the evidence, and are for the fact-finder to resolve, *see McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995), questions of admissibility are properly resolved by the court. *See, e.g., Spring*, 99 U.S. at 658 (jury decides the weight of the evidence once the court has admitted the evidence); *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123 (5th Cir.1988) (on summary judgment motion, district court has "broad discretion" to rule on admissibility of expert evidence). The resolution of evidentiary questions on summary judgment conserves the resources of the parties, the court, and the jury. *See Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir. 1985) (The "salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation.").

■■■ Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796–97, 125 L.Ed.2d 469 (1993), the district court functions as the gatekeeper for expert testimony.[5] *See McCullock*, 61 F.3d at 1042–43; *In re Air Disaster*, 37 F.3d at 824 (citing Fed.R.Evid. 702). The court performs the same role at the summary judgment phase as at trial; an expert's report is not a talisman against summary judgment. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987) (although the Federal Rules of Evidence "expanded the acceptable bases for expert opinion[,] ... this expansion does not extend to make summary judgment impossible whenev-

---

5. For expert testimony to be admissible, it must help the jury "to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591, 113 S.Ct. at 2795 (quoting Fed.R.Evid. 702); *see also United States v. Kwong*, 69 F.3d 663, 668 (2d Cir.1995). This is essentially a relevance standard: "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591, 113 S.Ct. at 2795 (quoting 3 Weinstein & Berger ¶ 702[02], at 702–18).

er a party has produced an expert to support its position") (quoting *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir. 1977) (internal quotation marks omitted)).

The Fifth Circuit has summarized well the process for reviewing evidentiary issues in the summary judgment context:

> Although we review grants of summary judgment *de novo*, that is, under the same Rule 56 standards as are used by the district court, in Rule 56 proceedings we still apply the manifest-error standard of review to the trial court's evidentiary rulings. Thus an appeal of a summary judgment presenting evidentiary issues raises two levels of inquiry. At the first level, we review the trial court's evidentiary rulings, which define the summary judgment record, and we give these rulings their due deference. At the second level, with the record defined, we review the trial court's summary judgment decision *de novo*. When the contested evidence is essential to the cause of action and the trial court has excluded the evidence, we may decide the appeal at the first level solely on the basis of the soundness of the evidentiary ruling. For if we uphold the exclusion of essential evidence, the second-level inquiry becomes academic.

*Christophersen v. Allied–Signal Corp.*, 939 F.2d 1106, 1109 (5th Cir.1991) (en banc) (per curiam) (internal citations and footnote omitted).

## 2. Inadmissibility of the Wertheimer Report

█ Statistical reports may of course be admissible to support an inference of discrimination. *See Hazelwood School Dist. v. United States*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741–42, 53 L.Ed.2d 768 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); *Hollander v. American Cyanamid Co.*, 895 F.2d 80, 84 (2d Cir.1990) (disparate-treatment plaintiff may use statistical evidence regarding employer's

practices to rebut non-discriminatory explanation for adverse employment action). In this case, however, the district court concluded that the Wertheimer report could not support such an inference. We agree that the report lacks probative value, for two central reasons.

(a) The report purported to compare Wyatt employees—with respect to their promotions and "terminations"—with their counterparts in the general population. To do so, Wertheimer compared the number of senior Wyatt managers in Raskin's age group with the general population of college-educated people earning over $75,000 per year in a managerial or professional occupation. But Wertheimer's analysis did not account for the presence in the comparison group of i) those without pension plans, and ii) the self-employed—categories of people who tend to work longer and to an older age than people who work for companies that have pension plans. Wertheimer's method thus artificially inflated the average retirement age in the "general population," and rendered that group an unrepresentative sample for his comparison with Wyatt employees. *Cf. Sobel v. Yeshiva Univ.*, 839 F.2d 18, 35 (2d Cir. 1988) (statistical tools can produce meaningful comparisons to the extent that they account for distinguishing characteristics among individuals being compared).

Moreover, one of the report's central conclusions—that no one over the age of 50 was promoted during the relevant time period—is premised on an elementary statistical error. In a report that tracks Wyatt's employees over a 26–month period, Wertheimer ignores the promotions of people who turned 50 *during that period;*[6] Wertheimer's arresting conclusion therefore depends on the idea that Wyatt employees do not get older as time goes by. Such a conclusion is scarcely "helpful" to a jury within the meaning of Fed. R.Evid. 702.

(b) The Wertheimer report assumes that any anomalies in the Wyatt data must be

---

**6.** At least two Wyatt employees fall into this category: Charles Clemens and Gary Hallenbeck. Clemens was 49 on September 1, 1991, but was promoted on October 29, 1993 (during the 26–month study period) at age 51. Hallenbeck was promoted on October 27, 1993, at age 50.

caused by age discrimination, and makes no attempt to account for other possible causes. *See Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 657, 109 S.Ct. 2115, 2124, 104 L.Ed.2d 733 (1989) (without a showing of causation between the challenged practice and the alleged disparities, "employers [would be] potentially liable for the myriad of innocent causes that may lead to statistical imbalances in the composition of their work forces") (internal quotations and citation omitted). Thus the report arrives at its conclusions without accounting for, *inter alia,* the impact of the retirement plan, which (as Raskin argues) is designed to induce older workers to leave early, and will also have the effect of reducing career momentum as people approach early retirement. *Cf. Binder v. Long Island Lighting Co.,* Memorandum of Decision and Order, No. CV 88–1315, 1990 WL 137403, at *5 (E.D.N.Y.1990) (granting summary judgment for employer despite statistical chart showing higher termination rate for older employees, where chart did not account for other reasons, such as retirement benefits, why older employees might have left), *reversed on other grounds,* 933 F.2d 187, 193 n. 2 (2d Cir.1991) (expressly declining to rely on statistical chart), *overruled on other grounds, Fisher,* 114 F.3d at 1340. Because this report does not serve to make it more or less likely that Wyatt engaged in age discrimination, we cannot say that the district court committed manifest error by disregarding it.

The early retirement plan, Davis's statements, and the Wertheimer report raise no material issue of fact as to whether Raskin was passed over for the office managership by reason of age. We therefore conclude that the district court properly granted summary judgment on the ground that Raskin failed to substantiate his claim. *Cf. Black v. City of Akron,* 831 F.2d 131, 134–35 (6th Cir.1987) (affirming grant of summary judgment where flawed statistical evidence could not lead to inference of discrimination).

## C. Raskin's Constructive Discharge Claim

Raskin argues that there was a material issue of fact as to whether or not he was constructively discharged on account of his age when Daoust refused to give him the employment contract he wanted. The district court found that Raskin's fear "that he might suffer a reduction in his salary or job duties hardly rises to the level of 'intolerable' working conditions" necessary for a constructive discharge claim, and granted summary judgment for Wyatt. Raskin's complaint alleged that he was constructively discharged on account of his age in violation of the ADEA, but because we have found that Raskin has created no material issue of fact as to age discrimination, it does not matter whether Raskin was forced to leave or simply left; we therefore need not address the question. *See Stetson v. NYNEX Serv. Co.,* 995 F.2d 355, (2d Cir.1993) (where plaintiff alleges constructive discharge through age discrimination, failure to show material issue of fact as to either discrimination or constructive discharge warrants summary judgment in favor of employer).

## CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment to the Wyatt Company and dismissing Raskin's complaint.