**MINK MART, INC., Plaintiff,**

v.

**RELIANCE INSURANCE COMPANY, Defendant.**

**Reliance Insurance Company, Third–Party Plaintiff,**

v.

**Clemons Management Corp., Sidney J. Bernstein, Inc., Helena Furs, and North Atlantic Fur Processing Ltd., Third–Party Defendants.**

**No. 93 Civ. 4805 MGC.**

United States District Court, S.D. New York.

Sept. 14, 1999.

Dennis T. D'Antonio, Brian A. Andrews, Joshua L. Mallin, Weg and Myers, P.C., New York City, for Plaintiff.

James F. Campise, MarCigliano & Campise, New York City, for Defendant and Third–Party, Plaintiff.

James E. Ryan, Elliot Gaztambide, Jr., Dougherty, Ryan, Giuffra, Zambito & Hession, New York City, for Third–Party Defendants Clemons Management Corp. and Sidney J. Bernstein, Inc.

## OPINION

CEDARBAUM, District Judge.

The fur vaults of Mink Mart, Inc., located in a building on New York's Fashion Avenue, were damaged by water in July of 1992. Mink Mart and its insurer, Reliance Insurance Company, allege that the building's landlord, third-party defendant Clemons Management Corp., and the building's managing agent, third-party defendant Sidney J. Bernstein, Inc., are responsible for the damage. Clemons and Bernstein (for purposes of this motion, the "defendants"), originally impleaded by then-defendant Reliance, now move for summary judgment dismissing the claims asserted against them by Mink Mart and Reliance (for purposes of this motion, the "plain-

tiffs").[1] Plaintiffs contend that the cause of the damage was the central air-conditioning system, for which defendants were responsible. Defendants contest this, and argue that the damage was caused by an overflow of a lavatory sink, for which defendants were not responsible.

Defendants have also moved to exclude the opinion testimony of the expert proffered by plaintiffs.

## BACKGROUND

### I. Eyewitness Accounts

Mink Mart, a furrier, was the assignee of the lease to the ninth floor of 345 Seventh Avenue. (Pl.Ex.G.)

At approximately 7 a.m. on July 28, 1992, water damage was discovered in Mink Mart's garment and skin vaults on the ninth floor. The entire floor of the skin vault was covered with water, and a portion of the floor of the garment vault was covered with water. (Haralabatos Dep. 115, 59.) The garment vault is in the southwest corner of the building and the skin vault is in the southeast corner of the building.

Water was also discovered on the premises of Helena Furs, Inc., which leased the premises on the tenth floor directly above Mink Mart's vaults. The parties to this motion agree that the damage to Mink Mart's premises was caused by water from the tenth floor.

On the morning of July 28, Marinos, a tenth-floor subtenant, walked from the main factory (which is on the east side of the building) to the adjacent room (the "southeast room"). He first saw water in the southeast room, at the spot marked "C" on a blueprint agreed to by the parties. (Marinos Dep. 21–22.) Water covered the area from "C" to the area in front of the door to the lavatory. (Marinos Dep. 21–23.) In the lavatory, he saw water on

the floor and observed that one of the two sinks was filled to the brim. (*Id.* at 25, 46.) Marinos did not see any "water flowing." (*Id.* at 25.)

The building's night porter, Toote, was summoned. He "went up [to the tenth floor] and [saw] water on the floor." "Practically the entire floor had water on it." (Toote Dep. 30.) He testified that he saw water "throughout the entire place" and "[a]pproximately the entire floor" was covered with water. (Toote Dep. 43, 44.) Toote observed water on the floor of the lavatory. (Toote Dep. 47.) Toote also saw water in one sink and observed water dripping from one of the faucets into the sink. (Toote Dep. 78, 81.)

Tavernite, the building's superintendent, testified that "the water was coming from the sink in the bathroom, from an overflowing sink." (Tavernite Dep. 24.) Tavernite also testified that when he arrived, no faucets were turned on. (Tavernite Dep. 98.) He removed a ball of fur or hair from the sink, and the water then drained out. (Toote Dep. 78; Tavernite Dep. 51.) Tavernite also testified that he "seen water all over the factory area." (Tavernite Dep. 23.) It is not clear whether Tavernite was referring to the southeast room or the east room of the tenth floor. (2/5/99 Tr. 21.)

On the ninth floor, in Mink Mart's premises, Tavernite observed puddles of water on the floor and water dripping down the wall and from the ceiling. (Tavernite Dep. 101.) Haralabatos, Mink Mart's president, observed water on the ceiling near the wall that separates the skin vault and the garment vault. (Haralabatos Dep. 114.)

### II. Air Conditioner Repair and Plaintiffs' Expert Opinion

The tenth floor has two "water-cooled" air-conditioning units, the water for which is circulated from a cooling tower located on the roof of the building. (Tavernite ¶ 18.)

---

1. Mink Mart settled its claim against Reliance for $1.35 million in February of 1998. (JPTO

Dep. 14.) Each unit consists of a compressor and a condenser. (Fernandez Dep. 169.)

The compressor for one of the air-conditioning units on the tenth floor had been replaced by Winston Mechanical Corp. on July 27 because the compressor had "burnt out." (Pl.Ex. E; Fernandez Dep. 159, 168; Marinos Dep. 14.) That unit is located in the southwest corner of the east room, at the place marked "Z" on the agreed blueprint. (Fernandez Dep. 28.) An invoice titled "Compressor Replacement" describes the repair work. In addition to replacement of the compressor itself, the invoice describes ancillary tasks including the following: "-Disconnect electrical supply and remove feeders.... -Provide and install new suction and discharge valve gasket assemblies. -Reclaim refrigerant as per environmental control board rules.... -Pressure system and test for refrigerant leaks." (Def.Ex.K.) The repairman testified that he did no work on the condenser on July 27. (Fernandez Dep. 171–72.)

The repairman testified that the pipe supplying water from the cooling tower connects to the *condenser*, and that there is no need to shut off the valves controlling the water from and to the cooling tower when replacing the *compressor*. (Fernandez Dep. 171.)

Plaintiffs proffer an affidavit from Howard Zweig, a "consulting structural engineer." (Zweig Aff. ¶ 3.) Zweig testified by affidavit that during his inspection in August and November 1995 (three years after the water damage occurred), he "noted that an air conditioning unit, which was used to cool the factory portion of the tenth floor, was located approximately above the water-stained areas of the ninth floor premises." (Zweig Aff. ¶ 4.) Zweig opined that this air-conditioning unit was the cause of the flood. (Zweig Aff. ¶ 11.)

Zweig surmised that following the replacement of the compressor by Winston Mechanical, there was a breach in the valve on the compressor. Because there is no evidence that the repairmen saw a leak when they left the premises, Zweig further surmised that there was an air lock in the pipe network that temporarily impeded the flow of water through the pipes. (Zweig Aff. ¶ 13.) (Zweig stated that "[w]hen valves are replaced or work is done on a compressor on an air conditioning system, it happens that air locks may develop in the pipe network." (Zweig Aff. ¶ 12.)) "Once the air lock cleared due to a build up of water pressure, the flow of water resumed and leaked from the compressor in [the] factory air conditioner. The pumping system to maintain water level then activated and exacerbated the flooding." [2] (Zweig Aff. ¶ 13.)

Zweig explained the absence of a report of an air-conditioner leak on the morning of July 28 as follows: "Water escaping through the compressor corrected the leak and closed the joint after significant flooding had occurred." (Zweig Aff. ¶ 13.)

Zweig also testified that based on his inspection of the premises three years after the flooding and a review of evidence submitted by the parties, "overflow of water from a sink in the bathroom could not have caused significant flood damage to the ninth floor premises." (Zweig Aff. ¶ 6.) He based that conclusion on the following: when subtenant Marinos locked the bathroom doors the previous evening, he did not notice any water on the floor (Marinos Dep. 48–49), the sink had an overflow drain, and the bathroom had a floor urinal and the bathroom floor was sloped to allow drainage into the urinal. (Zweig Aff. ¶ 6.)

Zweig's firm had previously prepared a report, on which plaintiffs no longer rely.

2. Tavernite testified that the cooling tower system is shut off between 8 p.m. and 6 a.m. every day. (Tavernite Dep. 16.) In addition, Marinos testified that the air conditioners on the floor were not turned on when he locked the tenth-floor premises at approximately 7 p.m. on July 27. (Marinos Dep. 18.)

In that report, dated April 26, 1996, Zweig's firm stated that the tenth-floor air conditioner "most likely was the source of the leaks," but also opined that a stoppage in the main sewer stacks may have caused the water damage. (Def.Ex.M.)

### III. The Lease

The lease for the tenth floor provides that the central air-conditioning units "are to be maintained by the landlord." (Def. Ex. D ¶ 45.)

The lease further provides: "Owner shall maintain and repair the exterior of and the public portions of the building. Tenant shall ... take good care of the demised premises including the bathrooms and lavatory facilities (if the demised premises encompass the entire floor of the building) and the windows and window frames and, the fixtures and appurtenances therein...." (Def. Ex. D ¶ 4.) The lease also provides that "[t]he water and wash closets and plumbing fixtures shall not be used for any purposes other than those for which they were designed or constructed and no sweepings, rubbish, rags, acids or other substances shall be deposited therein, and the expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the Tenant who, or whose clerks, agents, employees or visitors, shall have caused it." (Def. Ex. D Rules & Regs. ¶ 2.) On this motion, plaintiffs do not dispute defendants' contention that if the cause of the water damage was an overflowing sink in the tenth-floor lavatory, defendants are not liable.

### DISCUSSION

#### I. Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether a genuine issue exists, a court must "examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." In re Chateaugay Corp., 10 F.3d 944, 957 (2d Cir.1993). Nevertheless, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### II. Admissibility of Expert's Affidavit

■ On a motion for summary judgment, "[s]upporting and opposing affidavits ... shall set forth such facts as would be admissible in evidence." Fed.R.Civ.P. 56(e). It is appropriate for district courts to decide questions regarding the admissibility of evidence, including expert opinion evidence, on a motion for summary judgment. Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir.1997). An expert's affidavit "is not a talisman against summary judgment." Id.

■ Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all expert testimony is not only relevant, but reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, ——, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999). In order for an expert's opinion to be reliable and thus admissible, it must be grounded on verifiable propositions of fact. In re "Agent Orange" Prod. Liab. Litig., 611 F.Supp. 1223, 1249 (E.D.N.Y.1985), aff'd on other grounds, 818 F.2d 187 (2d Cir.1987). "Nothing in either [Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993),] or the Federal Rules of Evidence requires a district court to admit opinion evidence that is

connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at ——, 119 S.Ct. at 1179.

■ Zweig's opinion about the cause of the water damage is not supported by a reliable foundation. The only affirmative ground he asserts for his opinion is that it is possible that the air conditioner could have leaked. He also casts doubt on defendants' explanation that the sink overflow caused the damage.

There is no evidence—or even allegation—that the air-conditioning unit was leaking on the morning of July 28 or any time thereafter, or any time before. The repair had nothing to do with a leak in the pipes, and there is no evidence other than Zweig's speculation that there was a leak after the repair. There is also no evidence that the repair work conducted even affected pipes carrying water from the cooling tower, as opposed to refrigerant (freon or a similar gas) that is circulated through a compressor.

Moreover, Zweig's speculation is itself premised on speculation. He stated that *if* there had been a breach in the valves, it was not detected by the repairman before he left because an air lock *might* have developed that *might* subsequently have been cleared and lead to the leakage. He further stated that *if* there had been a breach and an air lock had developed but had been subsequently cleared, the breach *might* have been corrected by the force of the water after a substantial amount of water had already leaked.

Plaintiffs' counsel states that Zweig's opinion is also supported by "evidence of insufficient cooling tower water in the days following the flood." (Andrews Aff. ¶ 21.) However, he points to no such evidence. Counsel cites an August 6, 1992 invoice for repair of the air-conditioning unit for a tenant on a different floor of 345 7th Avenue. The invoice notes: "Please be advised that there is insufficient cooling tower water presently feeding condenser of HVAC unit. Supply and return piping should be replaced to prevent stress and overheating of compressor." (Pl.Ex.F.) The supply of water from the cooling tower to that unit was restricted because of the piping; the invoice does not suggest that the cooling tower itself had insufficient water. The plain meaning of the invoice is confirmed by the testimony of Fernandez, an employee of the repair company. (Fernandez Dep. 60.)

Zweig's testimony as to causation is not reasonably reliable. It does not provide a basis on which a rational jury can decide the cause of the flood without speculating. Accordingly, it is inadmissible.

### III. Failure to Make a Prima Facie Case

■ Plaintiffs have not proffered admissible evidence from which a reasonable juror could conclude that the air-conditioning unit caused the water damage.

As discussed above, the fact that the air-conditioning unit was repaired on the day prior to the damage is insufficient evidence of causation. Plaintiffs also rely on a few vague statements by the building's night porter, Toote. He testified that there was water "throughout the entire place." On the basis of Toote's imprecise testimony about the location of the water, plaintiffs argue that water covered the floor area near the air-conditioning unit. Defendants dispute this, noting that Marinos did not see any water in the room where the air-conditioning unit is located. Even if a jury could reasonably find that the wet floor area included the area near the air-conditioning unit, this finding does not reasonably support a conclusion that the air conditioner caused the water damage. Such a conclusion would be speculative.

Plaintiffs also argue that defendants were on notice of a flooding condition as a result of an overnight call by an employee of Holmes Security. Toote testified that on the night of July 27 or in the early morning of July 28, a Holmes employee rang the building's night bell because an alarm had been triggered. (Toote Dep.

16.) According to Toote, the Holmes's employee told him that he did not have the key to the premises in which the alarm had been triggered and accordingly left. (Toote Dep. 23.) Toote did not have keys to any tenant's premises. (Toote Dep. 73.) Plaintiffs argue that defendants failed to take reasonable measures in response to the incident to prevent Mink Mart's loss. Plaintiffs present no evidence, however, as to which alarm in the 25–floor building Holmes was responding to or why the alarm went off. Plaintiffs also fail to present evidence that any of the relevant tenants on the ninth or tenth floor had alarm service with Holmes. According to the undisputed testimony of Haralabatos, Mink Mart had alarm service with Kerman Protection. (Haralabatos Dep. 98.)

Finally, plaintiffs note discrepancies in defendants' explanation for the cause of the flood. For instance, there is conflicting testimony as to whether water was flowing from the sink on the morning of July 28 (although all relevant witnesses testified that the sink was full of water and that there was water on the bathroom floor). Plaintiffs also assert that the sink could not have been the source of the flood because any overflowing water would have drained through the floor urinal. While plaintiffs are correct that there are issues of disputed fact relating to defendant's account of the water damage, this is not a basis to deny defendants' motion for summary judgment on plaintiffs' claim. This is plaintiffs' lawsuit, and they bear the burden of proving their claim. While plaintiffs have cast some doubt on defendants' explanation for the water damage, they have not proffered evidence supporting their own theory.

Because plaintiffs have not proffered evidence from which a reasonable trier of fact could conclude that the cause of the accident was the tenth-floor air conditioner, summary judgment must be granted.

*IV. Res Ipsa Loquitur*

Plaintiffs argue that because the landlord had sole responsibility for the air conditioners, they can make out a negligence case based on a theory of *res ipsa loquitur* for water damage arising from an air-conditioner leak. However, this argument fails for the reasons already articulated: plaintiffs have not come forward with evidence showing that there was an air-conditioner leak.

At oral argument, counsel refined his argument. He contended that if a jury could find that the tenth-floor bathroom was not the cause of the water damage on the ninth floor, then a jury could conclude that the landlord was responsible for the damage on the basis of *res ipsa loquitur*. (2/5/99 Tr. 6–7.) This argument also fails. Application of the doctrine of *res ipsa loquitur* requires that the accident was caused by an agency or instrumentality within the exclusive control of the defendant. *Ebanks v. New York City Transit Auth.*, 70 N.Y.2d 621, 623, 518 N.Y.S.2d 776, 512 N.E.2d 297 (1987). Even under plaintiffs' new theory, they would need to demonstrate that any other instrumentalities that might reasonably have caused the water damage were in the exclusive control of the defendants. Plaintiffs have not made such a showing. Moreover, while plaintiffs have cast some doubt on defendants' explanation of the cause of the damage, they have not shown that the hypothetical air-conditioner leak was more likely than the lavatory sink to have caused the damage. *See generally Pollock v. Rapid Indus. Plastics Co.*, 113 A.D.2d 520, 526, 497 N.Y.S.2d 45, 50 (2d Dep't 1985) (the "general purpose" of the exclusive control requirement is to "indicat[e] that it probably was the defendant's negligence which caused the accident") (quoting *Corcoran v. Banner Super Market, Inc.*, 19 N.Y.2d 425, 432, 280 N.Y.S.2d 385, 227 N.E.2d 304 (1967)).

## CONCLUSION

For the reasons set forth above, the motion of Clemons Management Corp. and

Sidney J. Bernstein, Inc. for summary judgment on the claims of Mink Mart, Inc. and Reliance Insurance Company are granted.

SO ORDERED.