Michael ABRAHAMSON, James A. Behler, John P. Calogero, Albert A. Cerilli, Jr., Andrea Dombrowski, John P. Hotrovich, John C. Lumia, Nancy Moreau, Richard L. Nadeau, Stephen T. O'Loughlin, Roseann C. Secchia, Pamela Seeger, Ellen Metzger O'Shea, Philip K. Cameron, Jr., Margaret Mealia, Assunta Das, Greta M. Woo, George M. Kaiser, Carlos Picciotti, Plaintiffs–Appellees,

v.

The BOARD OF EDUCATION OF the WAPPINGERS FALLS CENTRAL SCHOOL DISTRICT, Wappingers Falls Central School District, The Wappingers Falls Congress of Teachers, Defendants–Appellants.

No. 02–7841(L), 02–7869(CON), 02–9401(CON), 02–9409(XAP), 02–9410(CON).

United States Court of Appeals, Second Circuit.

Argued: Feb. 23, 2004.

Decided: July 1, 2004.

Richard Hamburger (David N. Yaffe, David H. Pearl, on the brief), Hamburger, Maxson, Yaffe, Wishod & Knauer, LLP, Melville, NY, for Plaintiffs–Appellees.

Raymond G. Kuntz, Raymond G. Kuntz, P.C., Bedford Village, NY, for Defendants–Appellants Board of Education of the Wappingers Falls Central School District and Wappingers Falls Central School District.

James D. Bilik, Esq., Latham, NY, for Defendant–Appellant Wappingers Falls Congress of Teachers.

Before: STRAUB, B.D. PARKER, Circuit Judges, STANTON, District Judge.*

B.D. PARKER, JR., Circuit Judge.

Defendants-appellants Wappingers Falls Central School District and Board of Education of Wappingers Falls Central School District (collectively, "Wappingers" or the "School District") appeal from an order of the United States District Court for the Southern District of New York (McMahon, *J.*) granting summary judgment to plaintiffs-appellees ("the teachers") on their claim that a provision of a collective bargaining agreement negotiated by Wappingers and the Wappingers Falls Congress of Teachers (the "Union") violated the Age Discrimination in Employment Act ("ADEA" or "the Act"). The teachers contend that this provision excluded them from participation in an employment benefit on the basis of age and, therefore, violated the Act. They cross-appeal from the injunctive remedy fashioned by the District Judge, arguing that they are entitled to money damages, and from the District Court's refusal to award them attorneys' fees and costs. For the reasons that follow, we affirm the District Court's judgment that the collective bargaining agreement violated the ADEA and also affirm the injunctive remedy fashioned by the Court. We reverse in part and remand for further proceedings to determine an appropriate award of attorneys' fees.

## I. BACKGROUND

Plaintiffs-appellees are all tenured teachers over the age of 55 in the Wappingers Falls Central School District. Under the Collective Bargaining Agreement (CBA) in effect from 1998–2001, certain teachers were offered a Salary Elective Program (SEP) that acted as a retirement incentive. That SEP applied to teachers who met three criteria:

(1) 15 years of District service,

(2) 20 years of member service in the New York State Teacher's Retirement System (NYSTRS), and

(3) eligibility for a service retirement pursuant to the rules and regulations of the NYSTRS.[1]

Teachers who met these criteria for the first time during the term of that CBA had the opportunity to elect retirement during

---

* The Honorable Louis L. Stanton, United States District Judge for the Southern District of New York, sitting by designation.

1. Importantly, the third criterion can be met in a number of ways. Each of these ways save one requires that the teacher reach 55 years of age. The one exception is to have rendered 35 years of service under the system. As Judge McMahon found, qualifying under the 35–year scheme while not yet having turned 55 would be extremely difficult given the requirement that all teachers complete a four-year college degree. Here, all of the appellees became eligible for the SEP after reaching the age of 55.

the year they first became eligible and thereby obtain a $20,000 lump sum payment in addition to their other retirement benefits. Between 1998 and 2001, plaintiffs-appellees all met the three criteria for the first time but chose to continue working rather than to retire and collect the $20,000 payment. Under this provision of the SEP, the first year in which a teacher met all three of the criteria was the *only* time he or she could elect retirement and receive the $20,000 payment. If the teacher chose to continue to work, as each of the appellees did, she lost the opportunity to receive the $20,000 payment upon future retirement.

In June 2001, the Union and the School District negotiated and signed a new CBA governing the teachers' terms of employment to be in effect between 2001 and 2006. The new CBA modified the existing SEP by offering a second option, referred to by the parties as Option # 2. This second option retained the qualification criteria, and teachers continued to have the option to retire and receive the $20,000 payment when those criteria were met. However, teachers who met the retirement criteria for the first time between 2001 and 2006 were offered, under Option # 2, the additional choice to continue working and receive a $7,000 per year payment for three years. Thus, under the new CBA, a teacher who met all three of the eligibility criteria for the first time had two options in the year the teacher became eligible: (1) to retire and receive the same $20,000 payment that was available under the old CBA, or (2) to continue to work and receive an additional $7,000 per year for up to three years with no requirement that the teacher retire at any particular time. The practical effect of this arrangement

would be that teachers who chose Option # 2 would receive an augmented salary for three years that would then serve to increase their pension payments upon retirement. Appellees, who had chosen continued employment rather than retirement under the old CBA, were never offered Option # 2; it was available only to teachers who became newly eligible for retirement during the term of the new CBA.

In December 2001, the appellees sued Wappingers and the Union claiming that Option # 2 discriminated against them on the basis of age in violation of the ADEA, 29 U.S.C. §§ 621 *et seq.*, as amended by the Older Workers' Benefit Protection Act (OWBPA), 29 U.S.C. §§ 621, 623, and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* The District Court addressed the claims on cross-motions for summary judgment. Both parties agreed that whether Option # 2 was a retirement incentive plan or an employee benefit presented a question of law.

■ The District Court, in a comprehensive and thoughtful opinion, granted summary judgment to the plaintiffs on their ADEA and New York Human Rights Law claims.[2] The decision, dated June 21, 2002, came before any payments to teachers who chose to participate in Option # 2 were scheduled to begin (in September 2002), so no such payment were made. The District Judge issued an injunction ordering the defendants to bring the CBA into compliance with the ADEA, specifically contemplating that removing Option # 2 would accomplish this result. Shortly thereafter, plaintiffs' attorneys moved for an award of attorneys' fees under the ADEA in the amount of approximately $111,000. The District Judge denied the motion, finding that the appellees were not

---

**2.** Since the New York Human Rights Law statute mirrors the requirements of the ADEA, violation of one necessarily implies violation of the other. *Compare* N.Y. Exec. Law §§ 290 *et seq., and* 29 U.S.C. §§ 621 *et seq.*

"prevailing parties" under relevant case law because the legal relationship between the teachers and the School District had not been altered by the judgment.

Defendants-appellants appeal the grant of summary judgment, arguing that Option #2 does not discriminate on the basis of age and that, even if it does, it falls within the safe harbor for bona fide early retirement incentive plans specifically protected by the ADEA and OWBPA. 29 U.S.C. § 623(f)(2)(B). Plaintiffs-appellees cross-appeal, arguing that the injunctive remedy was improperly structured as they too should be allowed to participate fully in Option #2, and that they were entitled to attorney's fees under the ADEA.

## II. DISCUSSION

■ The District Court, with the consent of the parties, properly identified the question of whether Option #2 was an employee early retirement incentive plan as a question of law, which we review *de novo*. *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 26 (2d Cir.2002).

### A. Violations of the ADEA

■ The ADEA was passed "to promote employment of older persons based on their ability rather than age" and "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). The Act, in part, prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to establish a disparate treatment claim under the ADEA, an employee must make a prima facie case of discrimination, *Auerbach v. Bd. of Educ. of the*

*Harborfields Cent. Sch. Dist. of Green-lawn*, 136 F.3d 104, 109 (2d Cir.1998), by showing: (1) that the employee is a member of the protected class, (2) that the employee is qualified for the position, (3) that the employee suffered adverse employment action, and (4) that the circumstances surrounding the action give rise to an inference of age discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (noting that the *McDonnell Douglas* proof standard applies to ADEA claims).

Here, the District Court found, and neither party disputes, that the plaintiffs-appellees were members of the protected class as they were all older than age 40 at the time they were denied the benefits of Option #2. Further, no one disputes that the appellees were qualified to continue teaching in the Wappingers District as they all did exactly that. The teachers contend that they have also shown adverse employment action and that the circumstances surrounding the adoption of the CBA with Option #2 raises an inference of age discrimination. The School District and the Union contend that no adverse employment action has been shown and that, even if a prima facie case has been established, Option #2 falls within the safe harbor provision for bona fide early retirement incentive plans contained in § 623(f) of the ADEA.

### 1. Adverse Employment Action and Inference of Discrimination

The appellees argue, and the District Court agreed, that their exclusion from Option #2 and its $7,000/year benefit constituted an adverse employment action because it violated the ADEA by excluding

them on the basis of their age. The Union and the School District contend that no adverse employment action occurred because the teachers who now complain elected not to participate in the early retirement plan under the old CBA and, consequently, forfeited their right to participate in the new plan. They also argue that Option # 2 does not discriminate on the basis of age but, rather, is offered to all teachers who meet the service-based eligibility criteria for the first time under the new CBA. *See Hazen Paper Co.,* 507 U.S. at 609–14, 113 S.Ct. 1701 (holding that discrimination on the basis of non-age factors that may be correlated with age, such as pension status or seniority, does not violate the ADEA).

■ We hold here that the appellees met their *de minimis* burden of establishing a prima facie case of age discrimination under the ADEA. *See, e.g., Criley v. Delta Air Lines, Inc.,* 119 F.3d 102, 104 (2d Cir.1997); *Scaria v. Rubin,* 117 F.3d 652, 654 (2d Cir.1997). In *Auerbach,* we faced an almost identical question. There, the defendants' school district and union had implemented an early retirement incentive plan that provided a $12,500 cash payment when a teacher who had fulfilled the retirement criteria (reaching age 55 and providing 20 years of service under the NYSTRS) actually retired at the end of the first year in which they became eligible. That is, in order to receive the cash payment, those teachers who had reached age 55 were required to retire at the end of the first year in which they had completed 20 years of service and those teachers who had completed the 20 years of service were required to retire in the year they reached age 55. *Auerbach,* 136 F.3d at 107–08. If teachers did not retire in the first year they became eligible, they could not receive the lump sum payment at a future date. In considering whether the plan discriminated on the basis of age, we concluded that, because teachers who were over the age of 55 but had not retired in the precise year they became eligible were barred from the retirement benefit while teachers under the age of 55 who had fulfilled the plan's service requirements still have the future option of receiving the benefit, "age is a trigger for the denial of [the teachers'] employee benefits." *Id.* at 110. · Consequently, we held that the teachers in *Auerbach* had established discrimination on the basis of age.

The School District and Union argue that their requirements for eligibility differ from the *Auerbach* plan's requirements. They contend that Option # 2 is strictly based on years of service and not on age as was the case in *Auerbach.* However, this is simply not true. Option # 2 requires that teachers meet the service retirement criteria · established by the NYSTRS. Consequently, retirement eligibility is determined by when state service started. Those members who entered the system before July 1, 1973 are classified as Tier I, those who entered between July 1, 1973 and July 1, 1976 are classified as Tier II, and those entering after July 1, 1976 are · classified as Tier III. *Reichler v. New York State Teachers' Ret. Sys.,* 79 A.D.2d 268, 268–69, 437 N.Y.S.2d 754 (1981). Under both Tiers II and III, eligibility for retirement requires teachers to reach a minimum age of 55 and to have completed at least 30 years of credited service. N.Y. Retire & Soc. Sec. Law §§ 442(b)(1), 503(a). Under Tier I, there are three ways to qualify for retirement: two require the teacher to reach age 55 and complete either four or five years of state service while one allows a teacher who has accumulated 35 years of state service to be eligible for retirement regardless of whether or not he or she has reached age 55. N.Y. Educ. Law § 535(1).

The School District's contention that Option # 2 is entirely service-based rather than age-based is inaccurate. The only way to qualify for retirement under Option # 2 and have not reached the minimum age of 55 is to have joined the system prior to July 1, 1973 and have completed 35 years of state service. We agree with the District Court that this minor distinction is not enough to insulate Option # 2 from the logic and holding of *Auerbach.* Since all teachers must hold a four year post-secondary degree to qualify to teach grades pre-K through 12 and since the NYSTRS does not credit more than one year of service per calendar year or time of unpaid leave, it is extremely unlikely that any teacher who had not yet reached age 55 would ever have accumulated the 35 years of service necessary to qualify for retirement under Tier I. Thus we conclude that the reasoning of *Auerbach* applies here. Under Option # 2, teachers over age 55 (and those hypothetical teachers who accumulate 35 years of state service without reaching age 55) who do not elect Option # 2 in the precise year that they qualify under the service requirements are forever barred from receiving the $7,000/year benefit. However, teachers under 55, who have similarly met the other CBA service requirements for retirement still have the future ability to elect Option # 2 once they reach age 55 and qualify for retirement under the NYSTRS. Consequently, here, as in *Auerbach*, age—and not years of service—is the effective trigger for eligibility under Option # 2. This result constitutes a prima facie case of age discrimination.

## 2. The Safe Harbor Provision of the ADEA and OWBPA

■ Once the plaintiff has established a prima facie case of age discrimination, the defendant bears the burden of showing that his actions are lawful under the Act.

*Auerbach,* 136 F.3d at 112; *see* 29 U.S.C. § 623(f)(2). The School District and the Union contend that the ADEA's safe harbor provision permits them to carry this burden. The ADEA, as amended by OWBPA, provides that:

> It shall not be unlawful for an employer, employment agency, or labor organization—...
>
> (2) to take any action otherwise prohibited under subsection (a), (b), (c), or (e) of this section—...
>
> (B) to observe the terms of a bona fide employee benefit plan—
>
> (i) where, for each benefit or benefit package, the actual amount of payment made or cost incurred on behalf of an older worker is no less than that made or incurred on behalf of a younger worker ...; or
>
> (ii) that is a voluntary early retirement incentive plan consistent with the relevant purpose or purposes of this chapter.

29 U.S.C. § 623(f). Thus, an employee benefit plan that otherwise discriminates on the basis of age may still be valid under the ADEA if: (1) it adheres to the "equal benefit or equal cost" principle under which the employer expends equal amounts on both younger and older workers, or (2) it is a voluntary early retirement incentive under which an employer need not expend an equal amount as long as the plan is voluntary and consistent with the ADEA's goals of protecting workers from arbitrary age discrimination. *Auerbach,* 136 F.3d at 112. Here, the School District and the Union do not contend that Option # 2 is saved by the "equal benefit or equal cost" rule.

They do, however, claim that Option # 2 is a voluntary retirement incentive plan exempt from the Act under § 623(f)(2)(B)(ii). They argue that Option # 2 is "truly voluntary," is made available for a reasonable amount of time, and does not arbitrarily discriminate on the basis of age. But these contentions miss the mark since they only address whether an *actual* early retirement plan is voluntary and thus valid under § 623(f)(2)(B)(ii). *Auerbach,* 136 F.3d at 112–13 (quoting S.Rep. No. 101–263, at 28 (1990)). They tell us nothing about the answer to the predicate question of whether the plan is, in fact, an early retirement incentive plan.

In *Auerbach,* we began our analysis with the determination that "the sick leave benefit is, in fact, a retirement incentive under the plan because the sick leave benefit is not paid out unless and until a teacher retires under the plan." *Id.* at 112. The teachers would have us read this statement as a requirement that any plan that does not mandate actual retirement cannot be an early retirement incentive plan. We decline to decide whether such a broad interpretation of our statement in *Auerbach* is appropriate, since it only asserted that *if* a plan mandates retirement in exchange for a benefit *then* it is an early retirement incentive plan. The teachers incorrectly conclude that the converse must also be true—that *if* a plan does not mandate retirement, *then* it is not an early retirement incentive plan. It is unnecessary for us to resolve the question of whether such a converse rule should apply because we have no trouble concluding, on a different basis, that Option # 2 is not an early retirement plan.

Regardless of whether an early retirement incentive plan must invariably mandate retirement in exchange for a benefit, an early retirement plan must, at a minimum, provide some *incentive* to retire. In other words, the plan must make retirement a *relatively* more attractive option than continuing to work. Consider, for example, the plan in *Auerbach,* which offered a $12,500 payout if the teacher retired in the first year of eligibility. In the absence of the plan, a teacher could choose to continue to work and earn her usual salary or choose to retire in the year she met the criteria and begin drawing a pension. With the plan, retirement became more attractive than continuing to work because the teacher received an additional $12,500 payout from retirement, while continued employment yielded the same salary as before.

■ Here, Option # 2 provides no real incentive to retire because it does not make retirement a relatively more attractive financial option than continuing to teach. In the absence of Option # 2, a teacher meeting all the criteria for the first time can retire or continue teaching. With Option # 2, the teacher has the identical option of retiring when first eligible and starting to collect a pension—the same pension as in the absence of Option # 2. Thus Option # 2 has not made retirement more attractive relative to continuing to work for this teacher and, therefore, has not supplied any incentive to retire. On the contrary, Option # 2 actually supplies the incentive to continue working. Without Option # 2, the teacher could continue working with the usual salary increases but now, with Option # 2 in place, the same teacher could continue working and receive an extra $7,000 per year for three years. So, if anything, Option # 2, by supplying $7,000 salary increases, makes continued employment relatively more attractive than retirement and actually encourages teachers to work for at least three years beyond when they first become eligible for retirement.

The School District and Union argue that Option #2 was intended to induce early retirement and that "common sense ... indicate[s] that those who choose Option 2 would in fact be expected to retire immediately, or not long, after the three-year period ends." Applt. Br. of Wappingers Congress of Teachers at 19. This "common sense" argument hinges on what appellants term the "laws of economics and psychology." *Id.* at 20. They posit that a teacher who selects Option #2 but then does not retire at the end of the three-year period would suffer a significant drop in salary when the $7,000 payments ceased and would, therefore, have to work a substantial number of additional years in order to receive a pension equivalent to one that included the $7,000 in the final annual salary on which a pension would be calculated.[3] The School District and Union believe that this means an incentive exists to retire after three years because—in their words—the marginal utility of continued employment declines thereafter due to the time it would take a teacher to boost his pension payment over that reached using the three-year period as the final average salary. *See Abrahamson v. Bd. of Ed. of the Wappingers Falls Cent. Sch. Dist.,* 2002 U.S. Dist. LEXIS 11054 at *22 (S.D.N.Y. July 21, 2002).

But a teacher's marginal utility of working extra years is not limited to the prospect of increasing her final pension payout—it also includes the marginal income generated by another year's employment. Thus, a teacher who elects Option #2 and finishes the three-year period of service at the increased salary will not face any incentive to retire then either. The teacher could elect to retire at the end of the period and collect the increased pension payments. Alternatively, the teacher could work one more year, collect an extra year's salary, retire, and then collect *exactly the same* pension payments as she would have had she retired at the end of the three-year period (by electing the three Option #2 years in the calculation of her final average salary). *See* N.Y. Educ. Law § 501(11)(a), (b). In fact, she could work any number of extra years and *always* elect the three Option #2 years in the calculation of her pension benefits. Because a teacher who elects Option #2 can always choose to have those years serve as the basis for her pension calculations, retirement is made no more attractive relative to further employment, and there is, therefore, no incentive to retire at the end of the three-year period. The School District's and Union's argument that it was their intention to induce early retirement through Option #2 is irrelevant where, as here, the actual effect of the plan is to induce teachers not to retire

3. New York State's pension plan for teachers defines the "final average salary" used in calculating the pension to be "the average annual compensation earnable as a teacher during the five years of service immediately preceding his date of retirement, or it shall mean the average annual compensation earnable as a teacher during any five consecutive years of state service, said five years to be selected by the applicant prior to date of retirement," N.Y. Educ. Law § 501(11)(a), or, if the teacher joined state service before July 1, 1973, "the average regular compensation earned as a teacher during the three years of actual service immediately preceding his date of retirement, or any other three years of consecutive service upon application of the member ...." *Id.* § 501(11)(b). Thus, a teacher does not have to use his or her final five or three years of employment salary to calculate the pension amount but can choose to use any consecutive five or three years of her employment. Here, this means that a teacher that chooses Option #2 can *always* use those three years of elevated pay in order to calculate pension payments by simply electing a set of five or three consecutive years that include as many years of Option #2 pay as desired.

but to teach for at least three more years.[4] We therefore conclude that Option # 2 is not entitled to safe harbor protection as a valid early retirement incentive plan.

## B. Remedy

After finding that Option # 2 violated the ADEA and was not entitled to safe harbor protection, the District Court ordered the Union and the School District to bring the CBA into compliance with the Act. The District Judge concluded that the elimination of Option # 2 would be an acceptable way to achieve compliance. The teachers, on their cross-appeal, argue that the District Court abused its discretion by permitting this remedy and, instead, was required to order the School District and the Union to make Option # 2 benefits equally available to the plaintiffs and to award them back pay. Only this remedy, according to the appellees, would place them in the same position as if Option # 2 benefits had been offered to, and chosen by, them when they first became eligible for retirement. We must therefore consider whether the remedy of ordering compliance with the ADEA, possibly by eliminating Option # 2 altogether, was appropriate.

■ We review a district court's fashioning of equitable relief for abuse of discretion. *EEOC v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1534 (2d Cir.1996). The ADEA authorizes a district court "to grant such legal or equitable relief as may be appropriate to effectuate the purposes" of the Act. 29 U.S.C. § 626(b). We have previously held that district courts must " 'fashion remedies designed to ensure the victims of . . . discrimination are made whole.' " *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1214 (2d Cir.1993) (quoting *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727–28 (2d Cir.1984)). In practice, this means that a victim of discrimination must be "restore[d] . . . to the position he or she would have been in absent the discrimination." *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 362, 115 S.Ct. 879, 130 L.Ed.2d 852 (1995).

■ Applying this standard, we see no abuse of discretion. As we noted in *Auerbach*, the main objective of the ADEA is to prohibit arbitrary age discrimination. The District Court's injunction clearly met that objective. In requiring the CBA to be brought into compliance with the Act, the injunction ensures that the School District and Union will no longer be able to discriminate on the basis of age with respect to the Option # 2 program. Additionally, if Option # 2 is eliminated altogether, it can no longer cause discrimination on the basis of age, and the purpose of the Act has been served.

The remedy requiring compliance with the ADEA works to ensure that plaintiffs have been made whole in accordance with our previous case law. By requiring the defendants to bring the CBA into compliance with the ADEA, the District Court has guaranteed that plaintiffs will be treated in exactly the same manner as other employees. If the defendants choose to continue Option # 2 as originally drafted,

4. The appellants' reliance on *Raskin v. Wyatt Co.*, 125 F.3d 55 (2d Cir.1997), and *Fagan v. New York State Electric & Gas Corp.*, 186 F.3d 127 (2d Cir.1999), is misplaced as neither involved analysis of whether a plan was an early retirement incentive plan. Further, *Raskin* explicitly involved a plan that was conceded to actually require retirement in exchange for receiving the benefit at issue, a scheme all parties would recognize here as valid under the ADEA. *Raskin*, 125 F.3d at 61–62. In fact, we can find no cases, and defendants do not cite any, where a plan that did not require actual retirement has been upheld as a valid early retirement incentive plan. *See, e.g., Cipriano v. Bd. of Educ.*, 785 F.2d 51 (2d Cir.1986); *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824 (7th Cir.1987).

they will be required to allow plaintiffs to participate in it equally. But if they choose to simply take Option # 2 off the table, the plaintiffs would be left in the exact position they would have been in absent the discrimination. At that time, the $20,000 payment was the only one available to plaintiffs. Since no teacher was paid any benefit under Option # 2, its elimination would leave all parties as they were before the discrimination. Plaintiffs would still have been offered and rejected their $20,000 option, equally available to all similarly-situated teachers, and no other teacher would ever have had anything better. Thus, entry of an injunction contemplating that resolution was within the District Court's discretion.

This result is consonant with *Air Line Pilots Ass'n., Int'l v. Trans World Airlines, Inc.*, 713 F.2d 940, 955 (2d Cir.1983), *aff'd in part, rev'd in part, Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), where we mandated "equal treatment" rather than "special working conditions for older workers to allow them to remain or become employed," *id.* at 955 (internal quotation marks omitted), and where the Supreme Court held that if "[defendant] does grant some [persons similarly situated to plaintiff] [an employment benefit], it may not deny this opportunity to others because of their age." *Thurston*, 469 U.S. at 120–21, 105 S.Ct. 613. These cases make clear that the District Court was not obliged to allow Option # 2 to commence

payments in its original form, and make it available to plaintiffs.[5] The District Court's injunction guarantees exactly the equal treatment spoken of in these cases: if Option # 2 is made available to new retirees, it must be made available to plaintiffs as well. But if Option # 2 is eliminated with no new retirees having chosen it, all teachers have been treated equally as none were able to opt for the $7,000 yearly payment. Since plaintiffs-appellees have been made whole by the injunction, we hold that the District Court's remedy was appropriate.

## C. Attorneys' Fees

The ADEA authorizes reasonable attorneys' fees to a plaintiff who obtains a judgment. Section 626(b) provides that "the provisions of this [Act] shall be enforced in accordance with the powers, remedies, and procedures provided in [certain sections of the Fair Labor Standards Act.]" 29 U.S.C. § 626(b). Section 216(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, is one of these incorporated sections and provides that the court "shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). The FLSA language differs from the attorneys' fees language in other statutes such as Title VII, which provides that the court "may allow the prevailing party, other than the United

---

5. Although plaintiffs assert that this question is not presented to us on this appeal, we note that the elimination of Option # 2 was not the only way in which the CBA could be brought into compliance with the ADEA. In its June 21, 2002 decision, the District Court had stated that "[i]f Option # 2 permitted a teacher to work at a higher salary for three years, but compelled her to retire at the end of that three years, it seems to me that it should qualify as a perfectly legal retirement incentive under *Auerbach*." *Abrahamson*, 2002 U.S. Dist. LEXIS 11054, at *28–29. Ultimately, the School District and the Union chose to alter Option # 2 in just this way so that upon completion of the third year of additional payments, electing teachers are required to retire. We agree with defendants that they have cured the defect in Option # 2 by amending the Memorandum of Agreement to provide for mandatory retirement.

States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).

Here, the teachers' counsel petitioned the District Court for an award of attorneys' fees of $111,599.69, which included a twenty-five percent upward adjustment for the risk undertaken. The District Court, applying Title VII precedent, concluded that an award of attorneys' fees was not warranted because the teachers were not "prevailing parties." While recognizing that the teachers had obtained an enforceable judgment in the form of an injunction, the Court concluded that the judgment neither altered the legal relationship between the parties nor directly benefited the teachers in any way. *See Abrahamson v. Bd. of Educ. of Wappingers Cent. Sch. Dist.,* 01 Civ. 10859 (S.D.N.Y. Nov. 15, 2002) (order denying motion for attorneys' fees). Rather, it found that the injunction only provided plaintiffs with the "satisfaction of winning," something that did not entitle them to collect attorneys' fees. *See id.*

The teachers contend that the District Court misapplied the law because the ADEA, unlike Title VII, requires an award of attorneys' fees when a judgment is obtained, and that their lawsuit successfully advanced the purposes of the ADEA. The School District, on the other hand, contends that the District Court correctly applied prevailing party analysis to conclude that the teachers—who did not secure the opportunity to participate in Option #2 and who were not awarded damages—received no direct benefit from the judgment and are, therefore, not entitled to attorneys' fees. In sum, appellees ask us to rule that Title VII prevailing party analysis is inapposite in ADEA cases while appellants ask us to rule that it is appropriate.

██ The question of whether Title VII's "prevailing party" analysis applies to awards of attorneys' fees under the ADEA is unsettled in this Circuit. While some of our sister Circuits as well as district courts in this Circuit have applied the prevailing party standard to claims for attorneys' fees under the ADEA, they have done so without discussion or analysis. *See, e.g., Tyler v. Union Oil Co.,* 304 F.3d 379, 404 (5th Cir.2002); *Nance v. Maxwell Fed. Credit Union,* 186 F.3d 1338, 1343 n. 10 (11th Cir.1999); *Detje v. James River Paper Corp.,* 167 F.Supp.2d 248, 249 (D.Conn. 2001); *Soler v. G & U, Inc.,* 801 F.Supp. 1056, 1059 (S.D.N.Y.1992). And while our own Court has noted that in the ADEA context "the court had no discretion to deny fees to a prevailing plaintiff; its discretion extend[s] only to the amount allowed," *Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 86 (2d Cir.1983), we have never explicitly decided the question of whether "prevailing party" analysis applies to awards of attorneys' fees under the ADEA. We have no reason to decide that question here as we have no trouble concluding, on these facts, that even under the more stringent prevailing party test, the appellees are entitled to collect attorneys' fees.

██ It is well-settled that a plaintiff prevails when actual relief on the merits of a claim materially alters the legal relationship between the parties by modifying the defendants' behavior in a way that directly benefits the plaintiff:

> [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. Otherwise the judgment or settlement

cannot be said to "affect the behavior of the defendant toward the plaintiff."... In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.

*Farrar v. Hobby,* 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (citations omitted); *see also Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.,* 532 U.S. 598, 604, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). At a minimum, this modification occurs when a plaintiff obtains "an enforceable judgment on the merits," *Farrar,* 506 U.S. at 112, 113 S.Ct. 566, requiring some action by a defendant such as "payment of damages, or some specific performance, or the termination of some conduct." *Hewitt v. Helms,* 482 U.S. 755, 761, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987). Stated another way, a party must demonstrate such "material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). As long as a party succeeds on "any significant issue in litigation which achieves some of the benefit [they] sought in bringing the suit," *id.* at 789, 109 S.Ct. 1486 (internal quotation marks omitted), the party has "prevailed."

The teachers met these requirements, and obtained direct benefits and material changes that went beyond a simple favorable statement of law and beyond whatever personal satisfaction may have resulted from the elimination of Option # 2. They obtained an enforceable judgment that required the School District and the Union to bring the CBA into compliance with the ADEA. The existence of this injunction and the ability to enforce it against the School District materially alters the legal relationship between the parties as the defendants are now forbidden from operating the Option # 2 plan in a way that arbitrarily discriminates on the basis of age as they did before the lawsuit. *See Garland,* 489 U.S. at 792–93, 109 S.Ct. 1486. Thus, the teachers obtained through their judgment some, though not all, of the benefit they initially sought and consequently are entitled to attorneys' fees. *See id.* at 789, 109 S.Ct. 1486.

While the teachers' failure to achieve all of their objectives does not impact the right to fees, it may bear directly on the amount of fees that may properly be claimed. When, as here, "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount," and "the most critical factor is the degree of success obtained." *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The District Court may, in its discretion, "attempt to identify specific hours that should be eliminated, or it may simply reduce the [requested] award to account for the limited success." *Id.* at 436–37, 103 S.Ct. 1933. We leave to the District Court the determination of the appropriate balance between the degree of success the teachers achieved and the reasonableness of any fee they may request.

## III. CONCLUSION

For these reasons, we affirm the District Court's judgment requiring the defendants-appellants to bring the Collective Bargaining Agreement into compliance with the ADEA. We reverse the District Court's order denying attorneys' fees to the plaintiffs-appellees and remand for a

calculation of such fees consistent with this opinion.