## A. Michael SISTA, Plaintiff–Appellant–Cross–Appellee,

### v.

## CDC IXIS NORTH AMERICA, INC., Ramine Rouhani, Adil Nathani, Albert Zakes, Lawrence Laier, and Kemal Mehta, Defendants–Appellees–Cross–Appellants.

**Docket Nos. 05–1506–CV(L), 05–1625–CV(XAP).**

United States Court of Appeals, Second Circuit.

Argued: Oct. 21, 2005.

Decided: April 13, 2006.

---

Todd J. Krouner (Susanna L. Mould, of counsel), Law Office of Todd J. Krouner, Chappaqua, NY, for Plaintiff–Appellant–Cross–Appellee.

Howard J. Rubin (Maureen McLoughlin and Jane S. Friedman, of counsel), Davis & Gilbert, LLP, New York, NY, for Defendants–Appellees–Cross–Appellants.

Barbara L. Sloan (Eric S. Dreiband and Vincent J. Blackwood, on the brief), Amicus Curiae Equal Employment Opportunity Commission, Washington, DC, in support of Plaintiff–Appellant–Cross–Appellee.

Ann Elizabeth Reesman, Amicus Curiae Equal Employment Advisory Council, McGuiness Norriss & Williams, LLP Washington, DC, in support of Defendants–Appellees–Cross–Appellants.

Before: MINER and CABRANES, Circuit Judges, and CURTIN, District Judge.[1]

MINER, Circuit Judge:

Plaintiff-appellant-cross-appellee appeals from a judgment entered in the United States District Court for the Southern District of New York (Daniels, J.) granting summary judgment to all defendants-appellees-cross-appellants, (i) dismissing his claim for employment discrimination under the Americans with Disabilities Act, the District Court having determined that he did not establish a prima facie case of discrimination and that defendants had a legitimate nondiscriminatory basis for dismissing him; (ii) dismissing his claim for violation of the Family and Medical Leave Act, the District Court having determined that he (a) had not stated a claim on which relief could be granted and (b) did not establish his retaliation claim; (iii) dismissing his pendent state and municipal law claims; and (iv) denying his motion to amend his Complaint. Defendants-appellees-cross-appellants collectively appeal from the same judgment to the extent that it denies their motion for attorneys' fees and costs.

## BACKGROUND

### I. Factual History

In setting forth the following facts, we draw all inferences in favor of the party opposing summary judgment in the proceeding below, which in this case was the plaintiff-appellant-cross-appellee A. Michael Sista ("Sista"). Sista was employed by defendant-appellee-cross-appellant CDC Ixis North America, Inc. ("CDC"), an investment bank, between 1996 and 2001. In March 2001, Sista was promoted by CDC at the behest of his direct supervisor, defendant-appellee-cross-appellant Adil Nathani ("Nathani"), to a managerial position in the "structured credit group." In this capacity, Sista held supervisory authority over a number of employees. Sometime in the spring of 2001, Nathani asked Sista to integrate defendant-appellee-cross-appellant Kemal Mehta ("Mehta") into the group as one of Sista's subordinates. After Mehta joined the group, Sista complained about his performance, but nothing was done to address Sista's complaints.

On May 3, 2001, Sista telephoned the CDC office while away on a business trip. Pursuant to CDC policy, the telephone conversation was recorded because it relat-

---

**1.** The Honorable John T. Curtin, Senior Judge, United States District Court for the Western District of New York, sitting by designation.

ed to CDC's trading desk. After speaking with Mehta, Sista spoke to another of his subordinates, Paul Monaghan ("Monaghan"). Mehta overheard part of the conversation between Sista and Monaghan, though neither Sista nor Monaghan was aware of Mehta's presence. During a discussion of a transaction on which Mehta was working, Sista informed Monaghan that they would get another of Sista's subordinates to "beat [Mehta] up ... on the details." Mehta took offense at this remark, believing that it reflected Sista's determination not to let him participate constructively in certain transactions of the structured credit group. Accordingly, Mehta reported the conversation to Nathani.

On May 4, 2001, Sista met with Nathani. According to Sista, Nathani asked him whether he had threatened Mehta or arranged "to have [his subordinate] beat the shit out of [Mehta]." Sista denied the allegations. Nonetheless, Nathani informed Sista that he was demoted and that Sista "ran the risk" of being terminated. Nathani also told Sista that he intended to meet with defendant-appellee-cross-appellant Ramine Rouhani ("Rouhani"), Nathani's boss, to discuss whether to terminate Sista's employment. Nathani could have, but did not, recommend Sista's termination to Rouhani. Sista later acknowledged that what he had said about Mehta was "inappropriate" and that he was "sorry."

After his demotion, Sista became depressed. The week after the demotion, Sista stayed home from work and slept. Monaghan called to speak to Sista at home but spoke to Sista's wife instead. Monaghan intimated to her that if Sista wanted to keep his job, he should return to work. On May 30, 2001, Sista again met with Nathani. Sista's notes of the meeting indicate that Sista told Nathani that he wanted to speak with the human resources depart-

ment regarding a "mental health issue" that was "not impacting [his] ability to originate deals with [his] colleagues but it [was] having an impact on [his] family life." Nathani told Sista, that "[i]fits [sic] a benefits issue all you have to figure out is who the provider is, who do you use— not [an] HMO." Sista's notes reflect that Nathani would provide him with a list of physicians. After Sista informed Nathani that he would seek psychiatric help, Nathani stated that if Sista's condition impacted his ability to perform or if he perceived that Sista's condition had such an impact, Sista's transactions would be reassigned. Sista's transactions were not immediately reassigned.

According to Sista, Nathani did not provide the list of physicians, but instead told the human resources department not to help Sista. In a May 30, 2001, internal memorandum from Kimberly Sullivan ("Sullivan") to CDC's Director of Human Resources, defendant-appellee-cross-appellant Lawrence Laier ("Laier"), Sullivan stated that: "[Nathani is] now concerned that HR would tell [Sista] who to see professionally and based on what transpired through counseling would potentially damage CDC if brought to any kind of lawsuit." Sista contacted a psychiatrist, Dr. William Richardson, on his own. On June 4, 2001, he met with Dr. Richardson, who diagnosed him as suffering from a possible major depressive disorder and prescribed antidepressant medication. Sista did not tell anyone at CDC that he received a prescription for antidepressant medication.

On the morning of June 6, 2001, Sista met with Laier and secretly taped their conversation. Sista informed Laier that he had been to a psychiatrist because of his demotion. Sista was very agitated and shouted accusations about CDC pulling tapes of his telephone conversations and

violating his privacy. Sista demanded to know if there was an intention to "transition [him] out." Sista also asked for an official investigation concerning the circumstances of his demotion. After this meeting, Sista called his wife on a CDC-taped telephone line and stated that he "blew up" and "yelled" during the meeting and that he "did not know what was going to happen now." After this meeting Laier called Nathani and CDC's General Counsel, defendant-appellee-cross-appellant Albert Zakes ("Zakes"), to report on his conversation with Sista. The three arrived at a joint decision to encourage Sista to take time off.

That afternoon, Zakes called Sista to a meeting that Nathani and Laier attended. Sista secretly recorded this meeting also. Laier said that Sista was "extremely emotional," that he did not "believe at this point ... that [Sista was] able to see things in an objective and factual way," and that "CDC [was] prepared to work with" Sista. He advised Sista: "[I]f you would like ... some vacation time off, just take some time [to] putter around the house ... if you'd like to request Family [and] Medical Leave Act time, we will do that."

According to Sista, as the meeting progressed, he "could not control his mounting agitation" because of his demotion, the circumstances surrounding his demotion, his perception that his job security and livelihood were in jeopardy, and the denial of access to the CDC-taped conversation of his comments about Mehta. As he had done in his earlier meeting with Laier, Sista shouted and cursed during this meeting. While continuing to shout, Sista threatened Nathani. Specifically, Sista threatened: "If you pulled more than one tape, I swear to Christ ... I swear to Christ I'm comin' for you." Immediately after this outburst, Nathani exclaimed:

"Personal threat." Sista responded: "No, [n]o from a professional basis[,] I went to personnel." Laier informed Sista that he was being placed on paid leave of absence. Laier also told Sista that he would not be permitted to return to work at CDC unless he had a physician's note.

After Sista's threat, Laier had Sista's building pass deactivated and his access to CDC's server blocked. He also instructed CDC's facilities personnel not to permit Sista to enter the building. Nathani remained in Zakes' office for approximately two hours until Laier confirmed that Sista had left the building. Despite these other precautions, no one required security personnel to escort Sista from the building; indeed, they allowed him to remain and leave of his own accord. Laier also met with Mehta and another CDC employee and told them that Sista was potentially violent, had already threatened someone, and had mentioned both their names in an agitated way.

That night, Sista became depressed and attempted suicide by severing the artery in his left wrist. The next day, Sista's wife informed Laier that Sista had "cut himself and [the physicians] were keeping him." Laier told Sista's wife that her husband was on paid leave and that he would forward her some forms to be filled out. Sista was hospitalized for approximately one week.

Thereafter, Laier sent Sista a letter dated June 8, 2001, reciting that "[a]s a result of [the June 6th] threat, and your other behavior, we asked you to leave the premises and to take a paid leave of absence." The letter requested that Sista fill out enclosed forms for FMLA leave and further stated that "[i]n light of your recent behavior and your threat to another member of the company, we cannot let you return to work until we receive a letter from an appropriate medical professional

in the mental health field indicating that you are able to perform in an appropriate manner in the workplace." Sista signed and returned the forms in late June, informed Laier that he was still under a physician's care, and stated that he "[did] not agree with the tone or the content of [Laier's] letter."

Sista met with Dr. Richardson on June 12, 2001, and was given a prescription for Depakote, a drug intended to help with temper, anger control, and management of one's emotions. Dr. Richardson prescribed Depakote because it was his understanding that Sista was angry with his supervisor, Nathani. Sista had not at that time revealed to Dr. Richardson the threat he made to Nathani nor that he was on leave because of that threat.

By undated letter, which Sista received on August 17, 2001, Laier told Sista that his FMLA leave would end on August 30, 2001, and that he had until that date to provide a letter from his treating physician "indicating that [Sista was] able to return to work." The letter further stated that Sista's job was being held open at CDC until August 30, but if Sista was unable to return to work by that date, Sista's job would no longer be held open and he would be removed from the payroll. Sista alleges that he complied with all of the conditions necessary for reinstatement at the end of his twelve-week FMLA leave. He kept Laier apprised of his intentions and desire to return to work at the conclusion of the FMLA leave. He provided CDC a one-line letter, dated August 23, 2001, in which Dr. Richardson stated that "Anthony Michael Sista is cleared to return to work August 30, 2001"—the day Sista's FMLA leave expired.

On August 27, Sista emailed Laier, asking when and where to report on August 30. On August 29, Sista again emailed Laier, asking for a response to his previous email. Laier replied by email that same day, requesting a "more substantial and substantive statement" from Dr. Richardson "that will allow [CDC] to conclude that you may safely return to work." Laier also suggested that Sista should take some accrued vacation days and prepare to return to work on September 13, 2001. By that time Nathani, who was on vacation, would have returned. When Nathani returned from vacation, he informed Laier and Rouhani that he felt he was in danger because Sista had physically threatened him. According to Nathani, because Sista never apologized or recanted the threat, his return would be disruptive to the structured credit group. Rouhani agreed that Sista should be terminated.

After several conversations and communications between counsel for the parties, Sista's employment was terminated, effective November 30, 2001. Sista received his full salary and benefits during his twelve-week FMLA leave time, payment for two weeks of vacation time, and additional salary for the period from September 13 to November 30.

## II. *Procedural History*

Sista filed the instant action on May 6, 2002, and filed an Amended Complaint on June 11, 2002. In his Amended Complaint, Sista claimed: (i) discriminatory termination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.; (ii) violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, et seq.; (iii) discrimination on the basis of race, color, ethnic background, and national origin, in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); (iv) discrimination on the basis of disability, in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L.

§ 292(21); (v) discrimination on the basis of race, color, and national origin, in violation the NYSHRL, N.Y. Exec. L. § 290; (vi) discrimination on the basis of race, color, and national origin, in violation of the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8–107; (vii) discrimination on the basis of disability, in violation of the NYCHRL; and (viii) defamation. After discovery, all defendants-appellees-cross-appellants ("Defendants–Appellees") moved for summary judgment. At oral argument on that motion, Sista informed the court that he was abandoning all discrimination claims against Defendants–Appellees except for his ADA and FMLA claims and the related state and municipal law claims, and the District Court therefore granted summary judgment to Defendants–Appellees as to those other discrimination claims. The District Court further determined that Defendants–Appellees' motion for summary judgment would also be granted as to Sista's defamation claim because Sista had not opposed the motion as to defamation.

In relation to his ADA claim, the District Court determined that Sista could not make out a prima facie case under the ADA because "as a matter of law [he] cannot show that he was 'otherwise qualified' to perform his job at the CDC." The District Court noted that Sista's "threatening words were violent" and concluded that his conduct "violated CDC policy and render[ed] him not otherwise qualified." Alternatively, the District Court determined that Sista could not disprove CDC's "nondiscriminatory" reason for termination: "[Sista's] actions provided a reasonable basis to terminate his employment.... [Sista's] behavior was simply conduct which an employer could legitimately determine was inappropriate and unacceptable in the workplace." The District Court also dismissed Sista's pendent claims under the NYSHRL and NYCHRL on the same alternative grounds.

In relation to his FMLA claim, the District Court first determined that "involuntary leave is not actionable under the FMLA." The District Court then determined that "the right to reinstatement [after FMLA leave] is not absolute." Citing to this Court's decision in *Hale v. Mann,* 219 F.3d 61, 70 (2d Cir.2000), the District Court determined that, because Sista could legitimately have been fired for his actions before taking FMLA leave and because there was no evidence of termination in retaliation for taking FMLA leave, Sista could not make out his claim.

The District Court also denied a motion made by Sista during the discovery process for leave to amend his Amended Complaint, pursuant to Fed.R.Civ.P. 15(a), to add retaliation claims under Title VII, the ADA, NYSHRL, and NYCHRL against all Defendants–Appellees except Mehta. The District Court determined that there was no evidentiary basis for a retaliation claim.

Finally, the District Court denied Defendants–Appellees' motion for attorneys' fees and costs. The District Court found that Sista's race discrimination claims, though weak and ultimately abandoned, "were not so frivolous as to warrant an award of attorney's fees and costs" to Defendants–Appellees under *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

Judgment was entered February 16, 2004. Sista timely filed a notice of appeal on March 14, 2004. Defendants–Appellees timely cross-appealed on March 25, 2004. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

**ANALYSIS**

I. *Standard of Review*

A district court's grant of summary judgment is reviewed de novo. *Cellular*

*Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 492 (2d Cir.1999). This Court "utilizes the same standard as the district court: summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. City of New York,* 132 F.3d 145, 149 (2d Cir. 1998). A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997). In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *see also Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). However, the party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

## II. *ADA Claims*

■ Sista first claims that, in terminating his employment, CDC discriminated against him in violation of the ADA. The ADA prohibits discrimination against any "qualified individual with a disability because of the disability of such individual in regard to," inter alia, discharge from employment. 42 U.S.C. § 12112(a). ADA employment discrimination claims are subject to the familiar burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973): A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext. *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program,* 198 F.3d 68, 72 (2d Cir.1999).

■ To establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir.2001). In this case there is no question that CDC is subject to the ADA, nor is there any question that termination is an adverse employment action. Below, CDC and Sista disputed whether Sista was "disabled within the meaning of the ADA." The District Court did not address that issue, determining instead that Sista was not "otherwise qualified" and therefore unable to establish a prima facie case. For purposes of this appeal, we assume, arguendo, that Sista is "disabled within the meaning of the ADA" and, like the District Court, focus on the meaning of "otherwise qualified." [2]

**2.** Sista asserts that the NYSHRL an NYCHRL contain "less rigorous standards" for stating a claim than does the ADA and that, therefore, the District Court erred in granting summary judgment as to those claims on the same grounds as it granted summary judgment as

■ Relying on various authorities, the District Court determined that Sista could not prove that he was "otherwise qualified" as a matter of law because his threats and "physical violence against himself" had "violated CDC policy." *See, e.g., Palmer v. Circuit Court of Cook County*, 117 F.3d 351 (7th Cir.1997); *Valentine v. Standard & Poor's*, 50 F.Supp.2d 262 (S.D.N.Y. 1999); *Francis v. Runyon*, 928 F.Supp. 195 (E.D.N.Y.1996). The District Court reasoned that where an employee "poses a direct threat," defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation," 42 U.S.C. § 12111(3), that employee is not otherwise qualified to perform his or her job. *See Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 219–21 (2d Cir.2001).

The "poses a direct threat defense" is established by the statutory scheme of the ADA. The ADA provides:

It may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out or otherwise deny a job or benefit to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation, as required under this subchapter.

42 U.S.C. § 12113(a). "The term 'qualification standards' may include a requirement that an individual shall not *pose a direct threat* to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b) (emphasis supplied). As used in this context, "[t]he term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The "poses a direct threat defense" requires an "individualized assessment of the employee's present ability to safely perform the essential functions of the job ... based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r). When conducting such an "individualized assessment," the factors to be considered include "(1) [t]he duration of the risk; (2)[t]he nature and severity of the potential harm; (3)[t]he likelihood that the potential harm will occur; and (4)[t]he imminence of the potential harm." *Id.*[3]

■ When the District Court found that Sista had threatened Nathani and had "[blown] up" and "yelled" at Laier in violation of CDC policy, the District Court was articulating a legitimate non-discriminatory reason for CDC's subsequent termination of Sista, not a basis for finding that Sista "poses a direct threat" as defined by the ADA. The poses a direct threat defense is not applicable when an employee

---

to the ADA claims. However, Sista only points to a "less rigorous standard" as to the definition of disability. *See Giordano v. City of New York*, 274 F.3d 740, 754 (2d Cir.2001) (recognizing that "the definition of a disability under New York law is not coterminous with the ADA definition" (citations omitted)). In light of our conclusion that defendants had a legitimate nondiscriminatory basis for dismissing Sista, we need not reach the question of whether Sista could make out a prima facie case of discrimination based on a disability under federal or state law.

3. Although the parties disagree as to which party bears the burden of proving or disproving that an employee poses a direct threat and disagree as to whether this Court, in *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 219–21 (2d Cir.2001), held that the "poses a direct threat defense" is an affirmative defense to be proven by the defendant, we need not address this issue, given our resolution of this case.

actually *makes* a threat, despite the common use of the word "threat"; "poses a direct threat" is a term of art under the ADA, reserved for circumstances not presented by this case. *Cf. Lovejoy–Wilson,* 263 F.3d at 220–21 (determining that a convenience store clerk with epilepsy did not pose a direct threat to herself or others where the employer had not identified any time at which she failed to perform her duties or caused harm to others because of her affliction); *Hamlin v. Charter Tp. of Flint,* 165 F.3d 426, 431–32 (6th Cir.1999) (determining that an assistant fire chief could not perform front-line fire fighting duties because of a medical condition, but that no threat was posed because such duties were not an essential function of his job); *Mauro v. Borgess Med. Ctr.,* 886 F.Supp. 1349, 1352–54 (W.D.Mich. 1995), *aff'd,* 137 F.3d 398 (6th Cir.1998) (granting summary judgment to an employer-hospital where an HIV-infected surgical technician posed a direct threat to patients).

■ As the EEOC asserts in its amicus brief: "[A]n employer may discipline or terminate an individual who, because of disability, makes a threat against other employees if the same discipline would be imposed on a non-disabled employee engaged in the same conduct." *See also EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities,* at question 30, 8 FEP Manual (BNA) 405:7461, 7476 (March 25, 1997), *available at* http://www.eeoc.gov/policy/guidance.html (last visited February 13, 2006). Under these circumstances, no "individualized assessment," *see* 29 C.F.R. § 1630.2(r), is necessary because the employee is not being terminated for *posing* a "direct threat" as defined by the ADA, but rather for *making* a threat—a legitimate, non-discriminatory reason for termination—in accordance with the standard

*McDonnell Douglas* analysis. Moreover, rules established by the EEOC make clear that the "poses a direct threat defense" is meant to be applied in cases alleging discriminatory application of qualification standards as opposed to cases in which a plaintiff alleges "disparate treatment," which may be "justified by a legitimate, non-discriminatory reason." 29 C.F.R. § 1630.15(a), (b). Here, Sista does not claim that CDC's policies against employee misconduct and threats in the workplace constitute "qualification standards, tests, or criteria" that "screen out or tend to screen out" individuals with disabilities; rather, the gravamen of Sista's claim is that he suffered disparate treatment at the hands of CDC when he was fired for being disabled. Accordingly, the "poses a direct threat" defense has no applicability in this case.

■ In accordance with the foregoing, we apply the rule established in *Owens v. New York City Housing Authority,* 934 F.2d 405 (2d Cir.1991). In *Owens,* this Court stated: *"McDonnell Douglas* requires only a minimal showing of qualification to establish a *prima facie* claim. [A plaintiff] only needs to demonstrate that she possesses the basic skills necessary for performance of [the] job." *Owens,* 934 F.2d at 409 (internal quotation marks omitted; second alteration in original). This Court went on to explain the analytical distinction between (i) qualification for a job and (ii) disqualification arising from a legitimate, non-discriminatory, reason for an adverse employment decision:

> We have no doubt that … misconduct may certainly provide a legitimate and non-discriminatory reason to terminate an employee. This misconduct is distinct, however, from the issue of minimal qualification to perform a job. An individual may well have the ability to perform job duties, even if her conduct on

the job is inappropriate or offensive. Accordingly, the finding of misconduct here cannot preclude [the plaintiff] from showing her qualification for employment as required by *McDonnell Douglas*.

*Id.*

In *Thornley v. Penton Pub., Inc.*, 104 F.3d 26 (2d Cir.1997), this Court clarified *Owens*, noting that "[t]he point of our ruling was that 'misconduct' . . . did not [necessarily] correspond to the question of satisfactory performance . . . ." *Id.* at 29. We further explained that "*Owens* did not depart from our holdings that a plaintiff complaining of discriminatory discharge shows 'qualification' by demonstrating satisfactory job performance, in accordance with the particular employer's criteria for satisfactory performance," as some other courts had erroneously read it to. *Id.* at 29–30.

▓ The misconduct at issue in *Owens* was gross insubordination. *Id.* Here, CDC contends that it terminated Sista for a different type of misconduct—a threat made against his immediate supervisor. Although the District Court is correct that "[Sista's] actions provided a reasonable basis to terminate his employment" and that "[Sista's] behavior was simply conduct which an employer could legitimately determine was inappropriate and unacceptable in the workplace," these considerations go to the employer's ability to *rebut* a prima facie case in the second stage of the *McDonnell Douglas* framework, not to the showing of the prima facie case itself. The issue of "threats" comes into play only *after* the prima facie requirement has been met.

We believe that this approach—distinguishing between posing a threat and making a threat—maintains the necessary balance between "protect[ing] disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear,"

*Lovejoy–Wilson*, 263 F.3d at at 220 (internal quotation marks omitted), and permitting employers to protect themselves and their employees and customers from potentially violent employees, *see Palmer*, 117 F.3d at 352 ("The [ADA] does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge—in jeopardy of violating the [ADA] if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone."). This approach ensures that this Court, like every other court to have taken up this issue, does not read the ADA to require that employers countenance dangerous misconduct, even if that misconduct is the result of a disability. Moreover, this approach to ADA discrimination cases corresponds to the rest of this Court's *McDonnell Douglas* jurisprudence. In *Owens* and *Thornley*, we specifically recognized that "*McDonnell Douglas* requires only a minimal showing of qualification to establish a *prima facie* claim." *Owens*, 934 F.2d at 409. We think that our construction of the phrase "otherwise qualified" is preferable to that set forth by our sister circuits. *See Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290–91 (11th Cir.2002) (holding that an employee's "inability to work with others . . . insubordination, and threats of violence" rendered her not "otherwise qualified" within the meaning of the ADA); *Palmer*, 117 F.3d at 352 (7th Cir.1997) (holding that an employee's threats of physical violence rendered her not "otherwise qualified" under the ADA).

For the reasons stated above, we conclude that the District Court erred in holding that Sista was not "otherwise qualified" to reassume his position at CDC because he "pose[d] a direct threat" to his co-workers. Although we cannot state definitively whether Sista made a prima facie

showing under the ADA or related state and municipal laws without determining whether Sista's mental illness qualified as a disability, we need not address these questions to the extent that the District Court was correct in holding that CDC had a legitimate non-discriminatory basis for terminating Sista.

■ We now turn to the question of whether Sista has produced evidence that would tend to "show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." *Heyman*, 198 F.3d at 72 (internal quotation marks and citations omitted). To support the claim that he was fired on account of his mental illness rather than his past threat to a co-worker, Sista points to CDC's repeated invitations to return to work in the Fall of 2001 with the permission of a doctor, its failure to seek an alternative diagnosis of Sista's medical condition before firing him, and its failure to take certain safety precautions at the time when Sista was placed on involuntary leave in the Spring of 2001. Upon our review of the Record, however, we hold that Sista's arguments in this regard are insufficient to raise any "genuine issue of material fact," *see* Fed.R.Civ.P. 56, and therefore did not warrant a jury trial.

First, regarding Sista's arguments about the "suspicious timing of [CDC's] belated decision to terminate" his employment, we hold that no reasonable jury could conclude that CDC's provision of three months' paid leave for Sista—and further opportunities to express remorse or accept responsibility for his past actions—undermines the sincerity of its stated explanation for terminating Sista in the Fall of 2001. Second, CDC was in no way obligated to pursue alternative diagnoses of Sista's condition, and if anything, its failure to do so merely *confirms* that its decision to fire Sista did not depend on any perception of his mental state. Third, the Record reflects that CDC took several safety precautions in the Spring of 2001, including instructing security personnel that Sista was not to be permitted entry into the building. Because Sista can point to no evidence from which a reasonable jury could conclude that he was terminated on account of his mental illness rather than his past behavior, we conclude that the District Court did not err in granting summary judgment and dismissing Sista's ADA claims.

Finally, Sista asserts that the District Court erred by rejecting the possibility that CDC had "mixed motives" for terminating him. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir.1997) ("In mixed-motive cases, we use the different analysis set out in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion): [I]f the plaintiff establishes that a prohibited discriminatory factor played a 'motivating part' in a challenged employment decision, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway."). "The types of indirect evidence that suffice in a pretext case to make out a prima facie case—or even to carry the ultimate burden of persuasion—do not suffice, even if credited, to warrant a *Price Waterhouse* burden shift." *Raskin*, 125 F.3d at 60 (internal quotation marks and citation omitted). "Evidence potentially warranting a *Price Waterhouse* burden shift includes, *inter alia*, policy documents and evidence of statements or actions by decisionmakers that may be viewed as *directly reflecting* the alleged discriminatory

attitude." *Id.* at 60–61 (internal quotation marks and citation omitted) (emphasis in *Raskin* ). "[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Raskin,* 125 F.3d at 61. Sista cannot meet that burden here.

■ Upon our review of the Record, we agree with the District Court that Sista failed to present any direct evidence of discriminatory animus based on his disability and therefore was not entitled to a *Price Waterhouse* burden shift. Accordingly, we affirm the determination of the District Court, granting summary judgment to CDC as to Sista's ADA claim.

## III. *FMLA Claims*

The FMLA gives eligible employees an "entitlement" to twelve workweeks per year of unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).[4] The FMLA provides that at the end of an employee's leave the employee has the right to return to the position he held before the leave or its equivalent, *see* 29 U.S.C. § 2614, though this right is not absolute, *see* 29 C.F.R. § 825.214(b) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA."); *Sarno v. Douglas Elliman–*

*Gibbons & Ives, Inc.,* 183 F.3d 155, 161 (2d Cir.1999) ("The fact that Sarno was not restored to his position at the end of that 12–week period did not infringe his FMLA rights because it is also undisputed that at the end of that period he remained unable to perform the essential functions of his ... position."). The FMLA "creates a private right of action to seek both equitable relief and money damages against any employer (including a public agency) in any Federal or State court of competent jurisdiction" should that employer "interfere with, restrain, or deny the exercise of" FMLA rights. *Nevada Dept. of Human Resources v. Hibbs,* 538 U.S. 721, 724–25, 123 S.Ct. 1972, 155 L.Ed.2d 953 (2003) (internal citations omitted). Sista has based his FMLA claim on two separate arguments. We deal with each in turn.

### A. Involuntary Leave

Sista argues that he was "involuntarily" placed on FMLA leave, in violation of his rights under that act. The District Court, citing a handful of unpublished decisions from various district courts, determined that "involuntary leave is not actionable under the FMLA."[5] Sista asserts that, although an employer may be able to "impose" FMLA leave on an employee, it may only do so where the employee has a serious medical condition that would qualify the employee for such leave, citing to the same cases relied upon by the District Court. Sista claims that his "suicide attempt was a direct result of his anguish over CDC's imposition of the FMLA suspension." Whether involuntary leave is

---

**4.** "Serious health condition" is defined as: "[A]n illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11).

**5.** Although CDC asserts that there is no evidence to show that Sista was involuntarily placed on FMLA leave, this Court must assume, for purposes of summary judgment, that Sista was involuntarily placed on FMLA leave as there is evidence in the Record so indicating.

actionable under the FMLA is an issue of first impression in this Court.

■ The FMLA says nothing about an employer's ability to "force" an employee to take such leave, and such forced leave, by itself, does not violate any right provided by the FMLA. *Cf.* 29 U.S.C. §§ 2611 et seq. (establishing certain rights, including, inter alia, to take leave, to restoration of position, and to maintain a civil action). The FMLA does not create a right to be free from suspension with or without pay, nor does the FMLA create a right against infliction of emotional distress, which is the crux of Sista's claim here. If Sista were able to demonstrate that such a forced leave interfered with, restrained, or denied the exercise or attempted exercise of a right provided under the FMLA, a cause of action might lie. 42 U.S.C. §§ 2615(a), 2617(a). Under the circumstances of this case, Sista has not demonstrated an impingement on any FMLA right and, therefore, has not stated a cause of action under the FMLA.

B. Reinstatement

■ Sista claims that his FMLA rights were violated when CDC refused to reinstate him to employment at the end of his FMLA leave. The District Court determined that the FMLA does not require an employer to reinstate an employee "who would have lost his position even if he had not taken FMLA leave." *See* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement ... than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment."); *see also Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 979 (8th Cir.2005) ("As long as an employer can show a lawful reason, i.e., a reason unrelated to an employee's exercise of FMLA rights, for not restoring an employee on FMLA leave to her position, the employer will be justified to interfere with an employee's FMLA leave rights."); *Geromanos v. Columbia Univ.*, 322 F.Supp.2d 420, 429 (S.D.N.Y.2004) ("FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." (internal quotation marks and citation omitted)). The District Court determined that Sista could not "establish that he was discharged for taking the leave or that it was a 'negative factor' in [CDC's] decision to fire him." Moreover, the District Court determined that Sista could not prove that he was fired "in retaliation for taking FMLA leave."

Although the District Court's language hints at a distinction between FMLA "interference" claims and FMLA "retaliation" claims, the District Court did not discuss this distinction. In *Potenza v. City of New York*, 365 F.3d 165 (2d Cir.2004) (per curiam), this Court recognized a split in the approach taken in analyzing FMLA claims. *Id.* at 167. The first approach "insists on extending the *McDonnell Douglas* approach to claims pursuant to § 2615(a)(1)." *Id.* Thus, under this approach, courts apply the familiar burden-shifting framework already discussed. *See id.* (citing *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791 (11th Cir.2000)). The other approach, this Court noted, "emphasizes that violation of § 2615(a)(1) involves *interfering with* the exercise of rights given by the FMLA rather than *retaliating against* those who make use of their rights." *Id.* Under this second approach, a plaintiff need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative

factor in the decision to terminate her. She can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both .... No scheme shifting the burden of production back and forth is required.

*Id.* at 167–68 (quoting *Bachelder v. Am. W. Airlines, Inc.,* 259 F.3d 1112, 1125 (9th Cir.2001)) (alteration in *Potenza*). This Court noted with some favor the manner in which the Seventh Circuit had distinguished the approaches:

> A case from the Seventh Circuit emphasizes that the difference between the two approaches inheres in the relevance of the employer's intent to the determination of whether or not a violation has occurred. *See King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir. 1999). According to this account, it would be appropriate to apply the *McDonnell Douglas* analysis to claims of retaliation—where the employer's intent is material—but not to assertions of interference—where the question is simply whether the employer in some manner impeded the employee's exercise of his or her right.

*Potenza,* 365 F.3d at 168. But, because *Potenza* involved a retaliation claim rather than an interference claim, this Court did not "decide whether or not to adopt the Seventh Circuit's analysis in its entirety." *Id.* Instead, this Court determined only that retaliation claims would be governed by *McDonnell Douglas* analysis. *Id.*

Sista attempts to assert both "interference" and "retaliation" claims, though he does not indicate how this Court should distinguish between such claims.[6] Sista does not claim that CDC could not have

fired him for threatening his supervisor. Rather, Sista argues that the circumstances of this case—a delay between the making of the threat and the termination, with the exercise of FMLA rights in-between—raises the specter of "interference" with FMLA rights and of "retaliation" for exercising those rights. Regardless of whether Sista asserts an "interference" or a "retaliation" claim, he cannot show that CDC considered his FMLA leave and request to return a negative factor in its decision to terminate him. *Cf. Bachelder,* 259 F.3d at 1126 ("America West told Bachelder when it fired her that it based its decision on her sixteen absences since the January 1996 corrective action discussion. If those absences were, in fact, covered by the [FMLA], America West's consideration of those absences as a 'negative factor' in the firing decision violated the Act."). Moreover, Sista has failed to provide sufficient evidence from which a reasonable factfinder could conclude that CDC's stated explanation for firing him was merely a pretext masking impermissible retaliatory motives. *See Hale,* 219 F.3d at 66 (holding that, where "defendants articulate[ed] a nonpretextual reason for [plaintiff's] removal based on events which occurred prior to his going on leave," plaintiff could not sustain a FMLA claim because the FMLA "gives no greater job security than that to which the employee would have been entitled prior to taking leave").

Finally, Sista states that this Court, although it has not yet done so, should adopt a "mixed motive" test for FMLA retaliation. *See Raskin,* 125 F.3d at 60 (comparing "pretext" and "mixed motive" employment discrimination cases). Sista argues that this would be a "natural extension" of

---

**6.** Neither does Sista indicate what is required of an "interference" claim. Instead, Sista cites but one unpublished district court case as setting forth "elements" of a "prima facie" interference claim, ignoring entirely the discussion of "interference" claims in *Potenza,* 365 F.3d at 167–68.

existing employment discrimination jurisprudence. However, this Court need not determine whether to adopt a "mixed motive" test for FMLA retaliation cases because, assuming we did so, Sista could not prevail. As noted above, mixed motive cases present a greater burden of proof for plaintiffs. *See id.* at 61 ("[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment."). Upon our review of the Record, Sista cannot meet that burden here.

Accordingly, we affirm the determination of the District Court, granting summary judgment to CDC as to Sista's FMLA claim.

## IV. *Leave to Amend*

During the course of discovery, Sista moved for leave to amend his Amended Complaint, pursuant to Fed.R.Civ.P. 15(a), in order to add retaliation claims under Title VII, the ADA, FMLA, NYSHRL, and NYCHRL against all defendants except Mehta. On July 7, 2003, after the completion of discovery, the District Court denied this motion based on the "futility of amendment" due to a lack of evidence to support a retaliation claim. *See, e.g., Grace v. Rosenstock*, 228 F.3d 40, 53–54 (2d Cir.2000) (describing circumstances in which amendment would be futile). However, the District Court stated that it would "reconsider that motion" if Sista were to "present . . . any evidence developed during discovery to substantiate a retaliation claim." In its Memorandum Decision and Order, the District Court determined that Sista had still failed to establish an evidentiary basis for a retaliation claim and therefore denied his motion a second time.

Sista identified two examples of protected conduct that he alleged provoked retaliation. First, according to Sista, he complained of a "double standard" with regards to how he, as a white male, was treated in comparison to defendants Nathani and Mehta, who are both of Indian descent. Sista no longer pursues this theory on appeal, and we therefore do not address it.

Second, Sista claimed retaliation for the exercise of his ADA and FMLA rights. Sista argues that the District Court failed to address this argument below. Although the District Court did not address Sista's second argument in detail, it concluded that Sista did not "establish[ ] any evidentiary basis for a retaliation claim."

"The standard for reviewing the denial of a motion to amend a complaint is 'abuse of discretion,' keeping in mind that leave to amend should be freely granted when 'justice so requires.'" *Pangburn v. Culbertson*, 200 F.3d 65, 70 (2d Cir.1999) (internal citation omitted). To establish a prima facie case of retaliation in this context, Sista must demonstrate that (a) he "engaged in protected activity," (b) CDC was "aware of this activity," (c) CDC "took adverse action against [him]," and (d) "a causal connection exists between the protected activity and the adverse action, *i.e.,* that a retaliatory motive played a part in the adverse employment action." *Regional Economic Community Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir.2002). Because Sista failed to present sufficient evidence from which a reasonable jury could conclude that CDC terminated him on account of his decision to exercise his rights under the ADA and FMLA, we hold that the District Court did not err in denying Sista the opportunity to amend his complaint in this respect.[7]

## V. *Attorneys' Fees*

Below, Defendants–Appellees–cross-appellants sought attorneys' fees and costs, pursuant to 42 U.S.C. § 2000e–5(k), incurred in defending against Sista's Title VII claims. In *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), the Supreme Court, in interpreting 42 U.S.C. § 2000e–5(k), held that "a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless." *Christiansburg*, 434 U.S. at 422, 98 S.Ct. 694. This standard helps to "avoid chilling the initiation and prosecution of meritorious civil rights actions." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 765, 770 (2d Cir.1998). As the decisions of this Court demonstrate, it is very rare that victorious defendants in civil rights cases will recover attorneys' fees. *See, e.g., Tancredi v. Metropolitan Life Ins. Co.*, 378 F.3d 220, 230 (2d Cir.2004) ("Hindsight proves that plaintiffs' allegation ... was very weak, but it was not completely without foundation."). The District Court determined that: "While the fact [that Sista] has abandoned his discrimination claims suggest that they lack merit, this [c]ourt does not conclude that his claims were so frivolous as to warrant an award of attorney's fees and costs in this case." This Court reviews the District Court's determination whether or not to award attorneys' fees to Title VII defendants for an abuse of discretion. *LeBlanc–Sternberg*, 143 F.3d at 770. Defendants–Appellants argue that the District Court abused its discretion when it refused to grant attorneys' fees to them for plaintiff-appellants' "frivolous" complaint of race discrimination.

Sista, a male of Welsh/Italian descent, based his racial animus discrimination claim on an alleged conspiracy between Mehta and Nathani to falsely accuse him of having threatened to have Mehta physically harmed by an employee of CDC. Sista further alleged that his race was taken into account when CDC, Rouhani, and Nathani demoted him based on that false accusation. Sista dropped this claim at the oral argument on the motion for summary judgment, but—tellingly, in the eyes of Defendants–Appellants—had continued to allege it through the discovery process. Defendants–Appellants deem this alleged "Indian Conspiracy" a "wholly irrational and entirely racist suspicion"; argue that Sista, a white male who was well compensated, "has clearly not faced any of the barriers Title VII was enacted to remove"; and note that, during the discovery process, they twice asserted, in letters to Sista's attorney, that there was no evidentiary basis for any Title VII claim and warned that, unless such claims were immediately dropped, Defendants–Appellants would be moving for attorneys' fees.

Although the claim of racial discrimination in this case is "very weak," *cf. Tancredi*, 378 F.3d at 230, we agree with the District Court that it is not so frivolous as to warrant an award of attorneys' fees. Because nothing in the Record compels a contrary conclusion, we hold that the District Court did not abuse its discretion.

### CONCLUSION

For the foregoing reasons, the judgment of the District Court is affirmed.

---

7. Additionally, even if Sista could make out a prima facie case of retaliation, the Record contains no evidence from which a reasonable factfinder could conclude that CDC's stated reason for terminating Sista was a mere pretext for its retaliatory intentions.